304 F.2d 387
 The ATLANTIC REFINING COMPANY, Appellant,
v.
STANDARD OIL COMPANY (Incorporated in New Jersey) et al., Appellees.
INDEPENDENT REFINERS ASSOCIATION OF AMERICA et al., Appellants,
v.
STANDARD OIL COMPANY (Incorporated in New Jersey) et al., Appellees.
 No. 16721.
 No. 16725.
 United States Court of Appeals District of Columbia Circuit.
 Argued February 23, 1962.
 Decided June 7, 1962.
 Petition for Rehearing by the Division July 30, 1962.
 Petition for Rehearing En Banc Denied En Banc July 30, 1962.
 
 Mr. Henry B. Weaver, Jr., Washington, D. C., with whom Messrs. Ray S. Donaldson, Thomas C. Matthews, Jr., George A. Avery, Washington, D. C., and Roy W. Johns, Philadelphia, Pa., were on the brief, for appellant in No. 16,721.
 Mr. Elmer E. Batzell, Washington, D. C., for appellants in No. 16,725.
 Mr. Daniel M. Gribbon, Washington, D. C., with whom Messrs. Hugh B. Cox and Henry P. Sailer, Washington, D. C., were on the brief, for appellee Standard Oil Company (New Jersey).
 Mr. Morton Hollander, Attorney, Department of Justice, with whom Asst. Atty. Gen. William H. Orrick, Jr., was on the brief, for appellees Udall and Moore.
 Before WILBUR K. MILLER, Chief Judge, PHILLIPS, Senior United States Circuit Judge for the Tenth Circuit,[1] and FAHY, Circuit Judge.
 PHILLIPS, Circuit Judge.
 
 
 1
 Standard Oil Company, a New Jersey corporation, brought an action against Stewart Udall, Secretary of the Interior, seeking a declaratory judgment adjudging § 10(b) of Oil Import Regulation No. 1, as amended and revised, promulgated by the Secretary, purportedly under Presidential Proclamation No. 3279 of March 10, 1959, as amended, 19 U.S.C.A. § 1352a note, to be illegal, and that any method of allocation of imported foreign crude oil that distributes quotas in an inverse ratio to size of refinery inputs is illegal.
 
 
 2
 Independent Refiners Association of America, a corporation organized under the laws of the District of Columbia, Farmers Union Central Exchange, Inc., a Minnesota corporation, Frontier Refining Company, a Wyoming corporation, and Sioux Oil Company, a Colorado corporation, filed applications for leave to intervene in such action as of right, under Rule 24(a) (2) of the Federal Rules of Civil Procedure, 28 U.S.C., or in the alternative for permissive intervention in such action, under Rule 24(b) of such rules.
 
 
 3
 Number 16,725 is an appeal from an order denying such applications.
 
 
 4
 The Atlantic Refining Company, a Pennsylvania corporation, filed an application to intervene in such action as of right, under Rule 24(a) (2), or in the alternative for permissive intervention, under Rule 24(b).
 
 
 5
 Number 16,721 is an appeal from an order denying Atlantic's application.
 
 
 6
 The following facts appear from an affidavit of the Secretary of the Interior, filed in the instant action. In 1949, with the development of prolific oil fields in the Middle East, especially in Kuwait and Saudi Arabia, a large surplus of petroleum became available to the free world. According to the United States Bureau of Mines Minerals Yearbook for 1950, production in Kuwait increased from 16,000 barrels per day in 1946 to 250,000 barrels per day in 1949 and in Saudi Arabia from 21,000 barrels per day in 1944 to 475,000 barrels per day in 1949. The World Petroleum Statistics — 1960, No. 156 of the United States Bureau of Mines, listed total production in the Middle East for 1960 at 4,603,000 barrels per day.
 
 
 7
 Because these new fields are endowed with unusually large reservoirs of readily producible oil and because labor costs in the Middle East are considerably below those in the United States, the cost of producing a barrel of this foreign oil is considerably less than the cost of producing a barrel of crude oil in the United States. Moreover, tanker rates on foreign flag tankers hauling oil from the Persian Gulf and the Caribbean are not subject to United States Maritime Union rates prevailing on American flag tankers, which, pursuant to the provisions of the Merchant Marine Act of 1920, 41 Stat. 999, 46 U.S.C.A. § 884, must be used in hauling domestic oil from the United States ports on the Gulf of Mexico to the east coast ports of the United States. In view of the fact that the United States is the largest single consumer of oil, accounting for approximately 50 per cent of the world consumption, it was only natural that the surplus of cheap foreign oil would gravitate to United States markets. The United States Bureau of Mines Monthly Petroleum Statement No. 463 indicates that the United States was a net exporter in 1947 of 5,088,000 barrels of petroleum and by 1954 had become a net importer in the amount of 254,222,000 barrels and by 1960 such net amount of oil imports had increased to 591,784,000 barrels.
 
 
 8
 Postings in the Oil & Gas Journals for January, 1959, show 34 gravity Arabian crude at the port of Ras Tanura, on the Persian Gulf, was $1.80 per barrel, as opposed to Texas Refugio, 34 gravity at $3.23 per barrel and Louisiana Bayou Sale, 34 gravity at $3.18 per barrel.
 
 
 9
 Soon after the influx of cheap foreign oil began to supplant domestic oil, it became evident that if that trend was permitted to continue it would further discourage domestic production and exploration to the point where the United States would be relying almost entirely on foreign sources for its oil.
 
 
 10
 The maintenance of a strong, dynamic and healthy domestic crude oil industry is essential to insure an adequate amount of domestic oil and refined petroleum products in time of national emergency and thereby insure the national security of the United States. Hence, the purpose of the Proclamation, and Regulation No. 1, implementing such Proclamation, was not only to preserve a great national industry, but to prevent impairment of our national security. The Secretary, in the affidavit referred to above, stated it was to achieve those purposes that controls over the importation of foreign crude oil were imposed.
 
 
 11
 Because, by 1954, the rapidly increasing importation of low-cost foreign crude oil into the United States had become a matter of serious concern, both to the domestic petroleum industry and to Government agencies and officials having to do with petroleum matters, the President in that year appointed a Cabinet Committee on Energy, Supplies and Resources Policy to study oil imports. The Committee, after investigation and study, recommended that imports should not exceed the 1954 relationship of imports to domestic crude oil production. Further studies were undertaken between 1954 and July, 1957. On July 29, 1957, a voluntary import program was inaugurated. Under that program, import quotas were established by the United States for qualified importers, who were to adhere voluntarily to such quotas. However, some importers did not adhere and as a result further study was made by the Office of Civil Defense and Mobilization. The Director of that Office recommended the establishment of a mandatory import program, which was put into effect in 1959 through the Proclamation.
 
 
 12
 The Proclamation recited that crude oil and its derivatives were being imported in such quantities as to threaten national security, fixed permissible imports in Districts I to IV, inclusive, at approximately nine per cent of the total demand in the United States[2] and directed the Secretary to issue regulations allocating permissible imports, which regulations should provide "for a fair and equitable distribution among persons having refinery capacity in relation to refinery inputs * * * during an appropriate period or periods selected by the Secretary and may provide for distribution in such manner as to avoid drastic reductions below the last allocations under the Voluntary Oil Import Program."
 
 
 13
 In March, 1959, the Secretary promulgated Regulation No. 1, which imposes in part in § 10(b) the so-called sliding scale, for allocation of permissible imports. Under § 10(b) and the sliding scale therein established, importers who have average refinery inputs of 0 to 10,000 barrels per day are permitted to import 11.1 per cent of such refinery inputs; those who have average refinery inputs of 10 to 20,000 barrels per day are permitted to import 10.2 per cent of such refinery inputs; those who have average refinery inputs of 20 to 30,000 barrels per day are permitted to import 9.3 per cent of such refinery inputs, and in like manner the percentage of allowed imports decreases as the average refinery input increases. Standard characterizes this system as a method of distribution quotas in inverse relation to the size of refinery inputs. The fact is, that in each bracket each refinery is permitted to import the same percentage, but we are not here concerned with the merits.
 
 
 14
 Refiners Association is a nonprofit corporation, made up of independent refiners, all of which are organized, existing and operating in the United States. Each of such members is a marketer of petroleum products in interstate commerce, receives an allocation of crude oil to be imported into the United States on the basis of § 10(b) and in its respective marketing area competes directly with Standard and its subsidiaries. Farmers Union is a federated cooperative corporation in its petroleum activities. It is principally a refiner and through local cooperatives, which own all of its stock, it is a marketer of petroleum products in interstate commerce. Frontier is principally a refiner of petroleum products and markets such products in interstate commerce. Sioux Oil is principally a refiner of petroleum products and markets such products in interstate commerce. Farmers Union, Frontier and Sioux Oil each received an allocation of crude oil to be imported into the United States on the basis of § 10(b) and each in its respective marketing area competes directly with Standard and its subsidiaries.
 
 
 15
 Atlantic is an integrated petroleum company, engaged in the production, transportation, refining and marketing of crude oil and its products in interstate and foreign commerce. As an integral part of its business, it imports foreign crude oil into the United States and refines it in its refinery at Philadelphia, Pennsylvania. It has long engaged in foreign petroleum exploration and development and has a large investment in foreign oil producing activities, a substantial part of which has not yet been recovered. It is a marketer of petroleum products in interstate commerce and, as such, competes with Standard in the east coast petroleum market.
 
 
 16
 If the sliding sale in § 10(b) of Regulation No. 1 is adjudged to be illegal and set aside and if it is adjudged that any regulation based on a sliding scale would be illegal, the result would be to greatly increase the import quotas of Standard and other large integrated oil companies and very substantially reduce the import quotas of the members of the Refiners Association and of Farmers Union, Frontier, Sioux and other small nonintegrated, independent refiners.
 
 
 17
 Should a judgment be entered in the instant action adjudging § 10(b) to be illegal and setting it aside, each appellant in No. 16,725, as a direct legal result of such judgment, will suffer substantial injury.
 
 
 18
 The record before us indicates that counsel for the Secretary intends to defend the attack on the validity of § 10(b) on the ground that the Secretary is given a broad delegation of authority and that the exercise of his expert judgment can be disturbed only if it lacks rational basis and that the independent refiners must receive allocations of foreign crude oil great enough to enable them to offset the price differential in favor of foreign crude oil, in order to remain a part of a strong and healthy domestic refining industry.
 
 
 19
 On the other hand, such record shows that the appellants in No. 16,725 will undertake to meet such attack on § 10(b) on additional and broader grounds by marshalling and presenting the pertinent facts in the highly complex petroleum industry showing price differential between foreign and domestic crude oil, the effect of market conditions, the need for strategically located and widely dispersed refineries in time of war, the need for the survival of the independent producer, how the sliding scale is related to the independent refiners, how it is essential to their survival and the ultimate consequences to consumers, should § 10 (b) be invalidated.
 
 
 20
 Counsel for Standard assert that the appellants in No. 16,725 failed to show that the representation of their interest by existing parties in the instant action will be or may be inadequate and, moreover, that such appellants would not be bound by a judgment entered in the instant action. In support of their contention, they rely heavily on Sam Fox Publishing Co. v. United States,[3] 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604. But the circumstances in Sam Fox were substantially different from the circumstances in the instant case. In Sam Fox the "United States brought suit under § 1 of the Sherman Act, 15 U.S.C. § 1, 15 U.S.C.A. § 1, against the American Society of Composers, Authors and Publishers (ASCAP), an unincorporated association * * *, and certain of its officers." The suit "was aimed at two distinct types of antitrust violation: (1) alleged restraint of trade arising out of ASCAP's mode of dealing with outsiders desiring licenses of compositions in the Society's catalogue; and (2) alleged restraint of competition among the Society's members inter sese, resulting from the asserted domination of the Society's affairs by a few of its large publisher members who * * * were able to control the complexion of the Board of Directors and the apportionment of the Society's revenues." The appellants in Sam Fox were among the Society's publisher members.
 
 
 21
 A consent decree was entered in the suit, which, in addition to provisions dealing with the Society's external affairs, "in broad terms, contained requirements for Board elections by membership vote and for revenue distributions on an equitable basis." Thereafter, in 1950, a modified decree was entered at the instance of the Government, which commanded that "in order to insure a democratic administration of the affairs of defendant ASCAP * * * [the composition of the] Board of Directors shall, as far as practicable, give representation to writer members and publisher members with different participations in ASCAP's revenue distributions * * *."
 
 
 22
 Thereafter, the Government in 1959 sought and in 1960 obtained further modifications of the decree, which "represented a substantial improvement over the earlier provisions relating to Board elections and the apportionment of revenues."
 
 
 23
 Asserting that the modifications sought by the Government in 1959 "did not go far enough towards ameliorating the position of the small publishers as against the few large publishers," the appellants in Sam Fox "prior to the adoption of the modified [1960] decree," filed applications to intervene in the suit and sought broader modifications of the earlier decree than those being sought by the Government. The appeal in Sam Fox was from an order denying intervention.
 
 
 24
 In order to establish that representation of the interest of the applicant for intervention by existing parties is or may be inadequate, it is not necessary to show that such parties or their counsel are not acting in good faith, or are not properly discharging their duties, either in prosecuting or defending the action and we do not understand that Sam Fox holds to the contrary.
 
 
 25
 It should be kept in mind that in Sam Fox the suit was one instituted by the United States to prevent further unlawful restraint of trade and that while one type of antitrust violation against which the Government sought relief was unlawful restraint of competition among the Society's members, inter sese, and the granting of such relief would benefit certain members of the Society, including the appellants in Sam Fox, the primary purpose of the suit was to prevent further violations of the antitrust laws. Therefore, what the appellants in Sam Fox sought to do was to inject themselves into an antitrust suit brought by the United States and control the relief to be sought by way of further modification of the decree and obtain relief which would go beyond what the duly constituted and authorized representatives of the United States from the Department of Justice had determined should be sought.
 
 
 26
 It was that situation that led the court in Sam Fox to say, "* * * sound policy would strongly lead us to decline appellants' invitation to assess the wisdom of the Government's judgment in negotiating and accepting the 1960 consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting." We think it clear that Sam Fox did not hold that where one seeks to intervene in an action in which the United States is a party and on its side of the controversy, it is necessary to claim bad faith or malfeasance on the part of the Government or its representatives, in order to show that representation by the United States will or may be inadequate.
 
 
 27
 Here, the appellants in No. 16,725 applied to intervene, not to seek a decree in anywise different from that sought by the Secretary, nor to do anything that would in anywise injure or prejudice the position of the Secretary. They merely sought to be permitted to present additional facts and grounds to support the validity of § 10(b) — defenses that were wholly consistent with and which could not in anywise prejudice the defenses asserted by the Secretary, a situation wholly different from that presented in Sam Fox.
 
 
 28
 We conclude that it is sufficient for the applicant to intervene to show, as the rule clearly provides, that such representation will, or may be inadequate.
 
 
 29
 We are of the opinion that it appears from the record of the proceedings in the lower court that the representation of the interests of the appellants in No. 16,725 by the Secretary will be or may be inadequate.
 
 
 30
 In Sam Fox the court found it unnecessary to pass on the question of the adequacy of representation, because it found that the appellants were not bound by the modified decree entered therein. In the opinion in Sam Fox the court said:
 
 
 31
 "* * * In United States v. Borden Co., 347 U.S. 514 [74 S.Ct. 703, 98 L.Ed. 903], it was ruled that it was an abuse of discretion for the District Court to refuse the Government an injunction against certain acts held violative of the antitrust laws, even though the same acts had already been enjoined in a private suit. It was there stated in clearest terms that `private and public actions were designed to be cumulative, not mutually exclusive' (id., at 518), and, quoting from United States v. Bendix Home Appliances [D.C.], 10 F.R.D. 73, 77, "`* * * [T]he scheme of the statute is sharply to distinguish between Government suits, either criminal or civil, and private suits for injunctive relief or for treble damages. Different policy considerations govern each of these. They may proceed simultaneously or in disregard of each other."' Id., at 518-519 [74 S.Ct. at 706].
 
 
 32
 "This principle is certainly broad enough to make it clear that just as the Government is not bound by private antitrust litigation to which it is a stranger, so private parties, similarly situated, are not bound by government litigation * * *."
 
 
 33
 The court, in effect, applied the doctrine of res judicata as the test for determining whether the appellants in Sam Fox would be bound by the modified judgment in that action.
 
 
 34
 It is now well settled that in conventional litigation, the test to be applied in determining whether an applicant for intervention under Rule 24(a) (2) will be bound by a judgment in the action is whether he would be bound by such judgment under the doctrine of res judicata.[4]
 
 
 35
 There can be no doubt that the appellants in Sam Fox could have maintained a private independent action for injunctive relief against ASCAP and its officers and directors to obtain the relief they sought by intervention in Sam Fox. And there is no reason why a court of equity in a private suit brought by the appellants in Sam Fox should consider the 1960 modified decree as anything more than a minimum toward insuring broader representation and more favorable income distribution and should a claim for further relief be made out by such appellants in such private suit, the court could grant such relief, so long as it was consistent with the 1960 decree and did not release or lessen the limitations and requirements imposed by that decree.[5] Hence, intervention was not vital to the appellants in Sam Fox.
 
 
 36
 But, the appellants in No. 16,725 cannot maintain an action against Standard to have § 10(b) adjudged valid and if Standard obtains a judgment in the action, adjudging such section to be invalid, there is no remedy they can invoke against Standard to obtain redress for the substantial injuries they will suffer as a result of such judgment. Such judgment will be as final and conclusive to them as if they were bound by it under the doctrine of res judicata. Hence, intervention is vital to the appellants in No. 16,725.
 
 
 37
 We are of the opinion, as this court held in Textile Workers Union of America v. Allendale Co., 96 U.S.App.D.C. 401, 226 F.2d 765, c. d. 351 U.S. 909, 76 S.Ct. 699, 100 L.Ed. 1444, that in actions brought by a private person to have an order or regulation of an administrative agency adjudged invalid, the res judicata test for determining whether an applicant for intervention in the action will be bound by the judgment therein is unworkable and inappropriate. This, because, as we have shown in the instant case, a judgment invalidating the order or regulation will result in substantial injury to those deriving direct benefit therefrom and will be as final and conclusive to them as if they were bound by it under the doctrine of res judicata and no remedy will be open to them to redress the loss they will suffer because of such judgment.
 
 
 38
 We conclude that the appellants in No. 16,725 will be bound by the judgment entered in the instant case, within the meaning of Rule 24(a) (2).
 
 
 39
 Adjudging § 10(b) to be invalid will neither increase nor decrease the allocation of foreign crude oil to Atlantic and will result in no direct or immediate injury to Atlantic. True, it will give Standard and some of the other large integrated oil companies a potential, competitive advantage over Atlantic, but it is not certain they could or would use such advantage to injure Atlantic in the territory served by Atlantic. Moreover, should Standard engage in unlawful competition with Atlantic, the latter will have a private remedy under the Federal antitrust statutes. Hence, we do not think it can be said that Atlantic, if not permitted to intervene in the instant action, will be bound by the judgment therein, within the meaning of Rule 24 (a) (2). Furthermore, we do not think the lower court abused its discretion, under the facts and circumstances here presented, in denying Atlantic permissive intervention under Rule 24(b).
 
 
 40
 The order appealed from in No. 16,725 will be reversed with instructions to permit such appellants to intervene in the action. In No. 16,721 the order denying intervention to Atlantic will be affirmed.
 
 
 41
 It is so ordered.
 
 
 
 Notes:
 
 
 [1]
 Sitting by designation pursuant to § 294(d), Title 28 U.S.Code
 
 
 [2]
 District V is the area west of the Rocky Mountains. Section 2(b) of the Proclamation provides: "In District V the maximum level of imports * * * shall be an amount which, together with domestic production and supply, will approximate total demand in that district * * *."
 
 
 [3]
 Hereinafter referred to as "Sam Fox."
 
 
 [4]
 Textile Workers Union of America v. Allendale Co., 96 U.S.App.D.C. 401, 226 F.2d 765, c.d. 351 U.S. 909, 76 S.Ct. 699, 100 L.Ed. 1444; Sam Fox Publishing Co. v. United States, 366 U.S. 683, 689, 690, 81 S.Ct. 1309, 6 L.Ed.2d 604; Sutphen Estates v. United States, 342 U.S. 19, 21, 72 S.Ct. 14, 96 L.Ed. 19, rehearing den. 342 U.S. 907, 72 S.Ct. 289, 96 L.Ed. 679
 
 
 [5]
 See Sam Fox Publishing Co. v. United States, 366 U.S. 683, 694, 81 S.Ct. 1309, 6 L.Ed.2d 604