GULF OIL CORPORATION et al.,
Appellants,

v.

Walter J. HICKEL, Secretary of the
Interior, et al.

No. 23492.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 20, 1970.

Decided Oct. 19, 1970.

Before LEVENTHAL and ROBIN-SON, Circuit Judges, and DAVIES\*, Judge, United States District Court for the District of North Dakota.

LEVENTHAL, Circuit Judge:

This case involves a challenge to a decision of the Oil Import Administrator, affirmed by the Oil Import Appeals Board, which denied the application of plaintiff-appellants, Gulf Oil Corp. and its affiliate in Puerto Rico (hereafter collectively "Gulf"), for an import allocation authorizing importation of 3,539 barrels per day (b/d) of foreign crude oil into Puerto Rico. Gulf brought this action to challenge the decision, on grounds of arbitrariness and exceptional hardship.

The District Court ruled "that the decision of the Board is reasonable and consistent with the evidence presented and is not arbitrary or capricious." Accordingly it denied the motion for summary judgment filed by Gulf, and granted the motions for summary judgment filed by defendants, Secretary of Interior et al., and by intervenor, Commonwealth Oil Refining Co. We affirm.

Mr. Jesse P. Luton, Jr., Houston, Tex., of the Bar of the Supreme Court of Texas, pro hac vice, by special leave of Court, with whom Mr. Thomas P. Kerester, Washington, D. C., was on the brief, for appellants.

Mr. Robert E. Kopp, Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., and Robert V. Zener, Atty., Department of Justice, were on the brief, for appellee, Hickel.

Mr. Daniel K. Mayers, Washington, D. C., with whom Messrs. Hugh R. H. Smith, and Dennis M. Flannery, Washington, D. C., were on the brief, for appellee, Commonwealth Oil Refining Co. Inc.

### I. Background and Administrative Rulings

This court has had occasion in the past to consider the history and purpose of the oil import quota program.[1] The program began because of an influx of cheaply produced foreign oil in the 1950's that threatened to discourage domestic production and exploration. Controls over the importation of foreign crude oil were imposed in furtherance of these objectives: (1) to preserve a great national industry and (2) thereby to prevent impairment of our national security by insuring an adequate amount of domestic oil and refined petroleum products in time of national emergency.[2]

---

\* Sitting by designation pursuant to Title 28, U.S.Code, Section 292(c).

1. See, e. g., Pancoastal Petroleum, Ltd. v. Udall, 121 U.S.App.D.C. 193, 348 F.2d 805 (1965) ; and Atlantic Refining Co. v. Standard Oil Co., 113 U.S.App.D.C. 20, 304 F.2d 387 (1962).

2. 113 U.S.App.D.C. at 22–23, 304 F.2d at 389–390. The case at bar does not involve the validity of the program as such, or

These quotas were instituted on a mandatory basis by Presidential Proclamation No. 3279 of March 10, 1959,[3] issued under the authority of 19 U.S.C. § 1862. Section 3(a) of the Proclamation authorized the Secretary of the Interior to issue implementing regulations thereunder, and section 4(a) authorized the Secretary to establish an Appeals Board to consider petitions by persons affected by such regulations. Section 3(b) (2) of the Proclamation, as amended, relates to oil imports into Puerto Rico and is set forth, in relevant part, in the footnote.[4]

The Secretary implemented the Proclamation with duly published Oil Import Regulations. Section 15 of Oil Import Regulation 1 provided for quotas for refineries in Puerto Rico. The footnote contains the text of § 15 as it stood in 1968 when Gulf filed the application in controversy.[5] Section 15, setting a

present an occasion for considering, e. g. whether overall interests of national security may be furthered by avoiding depletion of domestic petroleum resources.

3. 24 F.R. 1781. The proclamation, with amendments, also appears as a note to 19 U.S.C. § 1862 (1964).

4. 3(b) (2) Such regulations shall provide for the allocation of imports of crude oil and unfinished oils into Puerto Rico among persons having refinery capacity in Puerto Rico in the calendar year 1964 on the basis of estimated requirements, acceptable to the Secretary, of each such person for crude oil and unfinished oils. The regulations shall provide also that if, during a period comprising the same number of months as an allocation period and ending three months before the beginning of the allocation period, any such person ships to Districts I-IV or to District V unfinished oils or finished products (other than residual fuel oil to be used as fuel) or sells unfinished oils or finished products (other than residual fuel oil to be used as fuel) which are shipped to Districts I-IV or to District V in excess of the volume of unfinished oils or finished products (other than residual fuel oil to be used as fuel) which he so shipped or which he sold and were so shipped during the year 1965, the person's allocation for the next allocation period shall be reduced by the amount of the excess. In addition, the Secretary may provide by regulation for the making, in instances in which the Secretary determines that such action would not impair the accomplishment of the objectives of this proclamation, of allocations of imports of crude oil and unfinished oils into Puerto Rico to persons as feedstocks for facilities which will be established or for the operations of facilities which are established and which in the judgment of the Secretary will promote expansion of employment in Puerto Rico through industrial development, and such regulations shall provide for the

imposition of such conditions and restrictions upon such allocations as the Secretary may deem necessary to assure that any imports so allocated are used for the purposes for which an allocation is made and that the holder of such an allocation fulfills commitments made in connection with the making of the allocation. 24 F.R. 1781, 3527, 10133 (1959), as amended at 25 F.R. 13945 (1960); 26 F.R. 507, 811 (1961); 27 F.R. 9683, 11985 (1962); 28 F.R. 4077, 5931 (1963); 30 F.R. 15459 (1965); 32 F.R. 5919, 10547, 15701 (1967); and 33 F.R. 1171 (1968).

5. *Sec. 15. Allocations of crude oil and unfinished oils—Puerto Rico.*

(a) For each allocation period, the Administrator shall recommend to the Secretary an allocation of imports of crude oil and unfinished oils for each applicant having refinery capacity in Puerto Rico during the calendar year 1964 based upon estimates of the requirements of such applicant for the allocation period. Allocations will be made by the Secretary upon consideration of the Administrator's recommendations.

(b) If, during the calendar year 1968, a person who will receive an allocation under paragraph (a) of this section for the allocation period April 1, 1968 through March 31, 1969 ships to Districts I-IV or to District V unfinished oils or finished products (other than residual fuel oil to be used as fuel), or sells unfinished oils or finished products (other than residual fuel oil to be used as fuel) which were shipped to Districts I-IV or to District V in excess of the volume of unfinished oils or finished products (other than residual fuel oil to be used as fuel) which he so shipped or which he sold and were shipped to the respective districts during the calendar year 1965, the person's allocation for the allocation period April 1, 1969 through

maximum allocation for imports of foreign crude oil into Puerto Rico, is in furtherance of the large design of the overall regulatory scheme, to restrict importation of foreign oil into the continental United States. The allocation is made to applicants with refinery capacity in Puerto Rico and is based on the volumes needed to satisfy domestic Puerto Rican demand, plus the amount of oil and oil products sold and shipped into the continental United States in 1965, which was chosen as a historical base year.

The controversy before us concerns the application of the regulation to a complex fact situation. Prior to 1965, Gulf had entered into an exchange arrangement with Esso International, Inc. Esso had an agreement to buy from another Puerto Rico refiner, appellee Commonwealth Oil Refining Company, Inc. (Commonwealth), the requirements of Esso for refined products for sale in Puerto Rico. However, Esso found it more economical to buy the finished products it needed for sale in San Juan from Gulf's affiliate, Caribbean Gulf Refining Corporation (Caribbean), because Caribbean's refinery was close to San Juan, while Commonwealth's refinery was in Ponce, and involved a relatively uneconomic trans-shipment of the products. An exchange was arranged, with Gulf delivering to Esso in San Juan, and Commonwealth, on direction of Esso, delivering to Gulf in Ponce an equal amount of finished products, which Gulf shipped into the continental United States. This amounted in volume to 3,539 barrels per day in 1965.

In 1966, when a pipeline connecting Ponce and San Juan was completed, Esso cancelled its arrangement with Gulf and Caribbean and thenceforth it used products supplied by Commonwealth, moved by pipeline from the Ponce refinery, to satisfy its San Juan demand.

The issue is whether Gulf should get credit in its Puerto Rico import allocation for the 3,539 b/d of products it shipped in 1965 into Districts I–IV, the pertinent section of the continental United States, even though those petroleum products were not refined by Gulf.

In its opinion the Board considered the relationship of the regulation governing imports of crude oil into Puerto Rico to the overall regulatory scheme limiting imports of foreign crude oil into Districts I–IV—which cover the great bulk of U.S. refinery output and demand (District V being limited to the West Coast). The Board said:

The Board conceives of the fundamental issue in this appeal as represented by the question, what criteria determine the size of a Puerto Rican refiner's allocation to import crude and unfinished oils. In District I–V the answer is given by reference to recent eligible imports (or, to a lesser and diminishing degree, to historical imports). For Puerto Rico the answer is apparently quite different, namely, the refiner's estimate of product requirements for the year ahead. Yet the dissimilarity to the input formula applied to refiners in the 50 states may be more apparent than real. In Puerto Rico projected demand is taken as the

---

March 31, 1970 shall be reduced by the amount of the excess. Thereafter, each succeeding allocation made to such a person shall be reduced by the amount by which shipments (as described above in this paragraph) made by or attributable to such person during the calendar year immediately preceding the beginning of the allocation period exceeds shipments made by or attributable to such person during the calendar year 1965.

32A C.F.R. Ch. X, Oil Import Regulation 1 (Revision 5).

As used in this Regulation, "Districts I-IV" refers to the area east of the Rocky Mountains and "District V" is the area west of the Rocky Mountains. Puerto Rico comprises the third and final geographical area set up under the oil import program.

reflection of refiner's future requirements for crude, i. e., the link between inputs and refinery allocation is present.

At the close of 1967 or early 1968 a policy decision was made to eliminate shipments of petroleum products from Puerto Rico to District V and to limit such shipments to the other Districts to the 1965 level (except for special arrangements tied to development of the Puerto Rican economy). The device chosen for making these restraints effective was a limit placed on the individual refiner in Puerto Rico, with penalty (in the form of loss of future allocation) to any who might breach its individual limit. There is no intimation in Proclamation or Regulations that these specific policy instruments were accompanied by another policy change—to break the tie between the requirement for foreign crude oil and refinery production.

The Board believes that the petitioner is correct in saying that the applicable Regulations contain no explicit requirement that a refiner produce in its own plant the product shipped in order to establish a base respecting shipment to Districts I–IV. The Regulations are silent on the point, perhaps because the link to production was apparently understood and accepted since the inception of mandatory controls by all concerned, including the petitioner.

Gulf seems to be saying to the Board: we are a recognized refiner in Puerto Rico and not a mere merchant as are some other oil companies. With our refiner's status established, and in view of the absence of specific prohibition in the Regulation, we claim that part of the shipments base (and therefore of the refinery allocation) of our competitor refiner should be given to us on the basis of our merchant operations. Surely this is neither equitable nor logical. The Board cannot agree with petitioner that the Administrator erred in computing petitioner's current allocation.

Gulf contends that its interpretation is required by the plain wording of the Proclamation and Regulation. "The Regulation says that a penalty will be incurred only where one 'ships' or 'sells and ships' to Districts I–IV a volume greater than he 'shipped' or 'sold and shipped' in 1965. Gulf and Caribbean clearly 'shipped' or 'sold and shipped' to District I–IV in 1965 the 3,539 b/d involved in the Esso exchange agreement." (Brief at 18)

The Board, however, based its decision on its construction of the regulation as incorporating a "tie between the requirement for foreign crude oil and refinery production." (App. at 200) Accordingly Gulf was not credited with products which it shipped but did not refine.

## II. *Scope of Judicial Review*

■■ Gulf's challenge to the interpretation and application of the oil import regulation confronts it with "the burden facing one who seeks to overturn the interpretation and administrative application accorded by an administrative agency" to a regulation by showing "that the interpretation is not reasonable and the application lacks rational foundation." Pancoastal Petroleum, Ltd. v. Udall, 121 U.S.App.D.C. at 195, 348 F.2d at 807. As stressed in Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), deference is properly accorded by a court to administrative interpretations of statutes and regulations, unless plainly erroneous or inconsistent with the law or regulation. See 380 U.S. at 16, 85 S.Ct. at 801:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. * * * "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in mo-

tion, of making the parts work efficiently and smoothly while they are yet untried and new.'" Power Reactor Development Co. v. International Union of Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924. When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.

There are, of course, instances where the plain language of a regulation simply does not "bear the construction" furnished by the officer or agency involved. Such a case was Pike v. CAB, 303 F.2d 353 (8th Cir. 1962) on which Gulf relies —a case, it may be noted, where the penal aspect, of revocation of an airman's certificate, "prompts us to view the statute with an attitude of reasonable strictness and to demand for this case a stronger statutory or regulation basis than we are presently able to discover." (303 F.2d at 358)

■ The regulation in this case does not specifically address itself to the fact pattern before us. This is often, perhaps usually, the case, for if the regulation were explicit it is unlikely there would be a lawsuit. But it is hardly an objection to the Oil Import Regulations that they were not drafted so precisely as to anticipate or diagram the precise convolutions of the business arrangement between Gulf, Esso and Commonwealth. On the contrary, the likelihood if not inevitability that a regulation that on its face is addressed to relatively simple and recurring fact patterns will have to be applied, one way or another, to a fact pattern that is complex, unusual, and in all probability unanticipated, calls on the function of interpretation that is as much the province of the office or agency as that of promulgation. What is required is both a devotion to the intendment of the regulation and a concern to avoid an application that will "result in the denial of substantial justice." NLRB v. J. S. Popper, Inc., 113 F.2d 602, 603–604 (3d Cir. 1940).

## III. *The Board Was Not Irrational In Its Interpretation Of The Import Regulation*

■ We conclude, from examination of the history of the Oil Import Regulation program and the purpose and context of the regulations, that the Board was not irrational in its reading that this regulation, providing for a crude oil import quota, based on shipments, for applicants who are refiners, rests on the implied assumption that the shipment base refers to products that were refined as well as shipped by the applicant. The standard of deference set out in Udall v. Tallman applies with full vitality to the application of oil import regulations. As we pointed out in Pancoastal Petroleum, Ltd. v. Udall: "The administrative interpretation here challenged is supported by the general presumption of validity and in particular by the fact that the regulation is being interpreted and applied by a board which is an affiliate of, if not identical with, the officer who fashioned the wording." 121 U.S.App.D.C. at 195, 348 F.2d at 807.

■ The scheme of the Regulation, taken as a whole, is to limit imports of crude oil into the continental United States by giving quotas to refineries and basing these in part on their historical use of imported crude and in part on current position. "This program, in denying refineries generally the economic advantage of using large quantities of imported crude, which is substantially cheaper than domestic crude, necessarily imposes hardship in varying degrees upon the entire industry. That is the price which it must pay in the interest of the national security." Texas American Asphalt Corp. v. Walker, 177 F.Supp. 315, 327 (S.D.Tex.1959). In Puerto Rico the regulation permits importation of crude oil for the purpose of meeting current Puerto Rican demand. It comports fully with the basic thrust of the regulation to take it as also providing an historical, 1965-based quota, based on products that were not used within

Puerto Rico but were shipped to the continental United States, that was not available to the merchant shipper, but rather to the refinery-applicant which refined and shipped the products. The Regulation's structure is based on refinery capacity. *Compare* § 4(b) *with* § 4(e).

Gulf's position would stretch the regulation so as to make the historical base applicable to a shipper who did not refine the pertinent products in the base years. We do not think the Board acted unreasonably in rejecting that interpretation. Our conclusion is strengthened by the context of the regulation as a whole, and notably the consideration that the Import Regulation as a whole, i. e. in the structure for quotas for continental as well as Puerto Rican refiners, makes the historical base provision available to United States refiners who both imported crude and refined the crude they imported. That is in effect a basic ground rule of the administrative approach—and we see nothing unreasonable in the ruling that it was assumed and incorporated in, though not explicitly repeated in, the specific provision for Puerto Rican refiners which as a matter of practice had used the cheaper imported crude.

An historical base program naturally entails a mechanism for administration that comports with the general structure of the industry. We cannot say that the officers issuing the regulation, and the

Board applying it, were departing from the zone of the reasonable when they insisted on a control system that focused the historical base for products going into Districts I–IV by tracking down the historic usage to the company that actually refined the products.

■ The considerations of "certainty and clarity of administration" to which we adverted in *Pancoastal* [6] are furthered by the control mechanism linking historical quotas to historical processing by the refinery applicant. An agency confronted with a complex task may rationally turn to simplicity in ground rules, and administrative convenience, at least where no fundamental injustice is wrought. *Cf.* Carmichael v. Southern Coal Co., 301 U.S. 495, 511, 57 S.Ct. 868, 81 L.Ed. 1245 (1937).

While Gulf's own prior attitude is not conclusive on the matter, it supports the reasonableness of the Board's interpretation that Gulf acquiesced in the Board's approach before its business arrangements were altered.[7] Gulf disclaims any significance in the presentation of its pre-1968 allocation requests on the ground that nothing of significance was involved—it having been able, before the 1968 amendments, to import the 3,539 b/d by scheduling shipments into District V, and because they thereby "avoided a confrontation with the Administrator." (Brief at 12) That is a reason for not rejecting Gulf's present claim on grounds related to estoppel.

---

6. 121 U.S.App.D.C. at 195, 348 F.2d at 807.

7. On January 24, 1966, the Administrator wrote to Gulf and requested that it furnish a statement of "the actual shipments of finished or unfinished oils other than residual fuel oil * * * to Districts I-IV during calendar year 1965 which you so shipped or which you sold and was so shipped." (App. 258) A Gulf executive answered on February 21, 1966:

> [W]e wish to advise you of the actual shipments of finished and unfinished oils other than residual fuel oil to be used as fuel from the Caribbean Gulf Refining Corporation, Bayamon, Puerto Rico, to Districts I-IV during the calendar year 1965.

\* \* \* \* \*

This report includes all shipments made from Caribbean Gulf's Bayamon Refinery into Districts I-IV during the year 1965.

The total for which Gulf claimed credit in this letter was 5,050 b/d. This did not include the 3,539 b/d subject to the Esso-Gulf exchange agreement. That amount was not included in Gulf's application for allocation and import license for the 1966–67 period. Its application for the 1968–69 period was Gulf's first demand for recognition in its import allocation of the oil involved in the exchange agreement. This followed the cancellation of the exchange agreement.

But Gulf's prior acquiescence at least suggests the reasonableness, in terms of industry understanding, of the approach taken by the Interior officials and the Board.

### IV. *The Board Did Not Abuse Its Discretion In Denying The Adjustment Available In Case Of Exceptional Hardship*

We turn to the argument by Gulf that is based on equity in terms of the facts and background of this particular case, and on a claim of exceptional hardship.

There is no doubt that appellants have suffered an adverse business consequence because of the allocation ruling, but a contrary interpretation would have visited adverse consequences on Commonwealth in the form of a reduction of its quota. Gulf and Caribbean have the capacity to refine the 3,539 b/d they want, but are forbidden, to import. Clearly, before Esso's cancellation of the agreement, appellants imported and refined that very amount before delivering the products to Esso, receiving essentially a payment in kind from the delivery made by Commonwealth on Esso's instruction.

If Gulf had used this refinery capacity in the base year to supply its own products demand on the continent, it could have continued to do so. But for business reasons it chose to satisfy that demand with products refined by Caribbean and to use its Puerto Rico refinery capacity to satisfy Esso's demand in Puerto Rico.

■ The business arrangements involved in this controversy are not incomprehensible, at least when studied in the light of their history, but they are of considerable complexity. Administrative agencies and officers have a primary task to administer broad policy mandates for the common good of our society, and they cannot be required to refine their rules to assure tailor-made equity for each of the complexities that may arise. If they issue and interpret regulations which are rational and supportable in their general application, they cannot necessarily be charged with unreasonableness because in particular applications the regulations and general interpretations may grind with a rough edge.

The reasonableness of generalized application of the import regulations, structured to promote clarity of administration, is supported by the provision in the regulations for modification of allocations in case of "exceptional hardship." [8] A provision for adjustments in cases of extreme hardship is a meaningful component of a regulatory scheme. Such provisions can ameliorate the rigors of mechanical application of the rules in appropriate cases without making the application of the rules unduly complex for the agency. *See* Permian Basin Area Rate Cases, 390 U.S. 747, 822, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). In WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 321, 418 F.2d 1153, 1157 (1969), we took note that "a system where regulations are maintained inflexibly without any procedure for waiver poses legal difficulties." We observed: "The agency's discretion to proceed in difficult areas through general rules is intimately linked to the existence of a safety valve procedure for consideration of an application for exemption based on special circumstances."

■ With this perspective we turn to Gulf's claim that it was an abuse of discretion for the Board to refuse to grant the request made by Gulf on the grounds of exceptional hardship. The hardship claim is based on the loss of profits on the unused refinery capacity, and on the adverse consequences to its relationship with the government of the country from which it would import the

---

8. Section 4(b) of the Proclamation authorizes the Secretary of the Interior to empower the Appeals Board "to modify, on the grounds of exceptional hardship, or error, any allocation made to any person" under the regulations. Section 21(b) (1) of the regulation so provides.

crude oil if it were allowed to. In denying Gulf's request the Board said:

> Gulf has given relatively little effort to development of its claim of exceptional hardship. * * * Gulf estimates loss of profits in significant amount but the method and nature of this estimate are not explained and are not documented. The Board believes it may be possible for Gulf, with the scope and diversity of its operations, to adjust to its current Puerto Rican allocation without exceptional hardship. This belief is supported to some degree by the record which shows that petitioner has made some dramatic shifts in its product distribution patterns in recent years, apparently without financial distress. (App. at 200–01)

We think the Board did not abuse its discretion when it sought to reserve the "exceptional hardship" provision for cases of financial distress, so as to assure that the adjustment would not swallow up the program. The Board stated its approach with sufficient clarity for us to discern its path. The case calls for application of "salutary principles of judicial restraint." *See* Braniff Airways, Inc. v. CAB, 126 U.S. App.D.C. 399, 409, 379 F.2d 453, 463 (1967).

Affirmed.