454

NEW ENGLAND PETROLEUM
CORPORATION, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION
and Frank G. Zarb, as Administrator of
the Federal Energy Administration, De-
fendants.

No. 75 Civ. 6011 (CSH).

United States District Court,
S. D. New York.

June 9, 1976.

Benjamin T. Richards, Jr., New York City, Covington & Burling, William H. Allen, Washington, D. C. for Exxon Corp.

White & Case, Charles N. Brower, Thomas J. O'Sullivan, III, Andrew T. H. Monroe, J. Hayes Kavanagh, Ronald W. Davis, New York City, for New England Petroleum Corp.

## MEMORANDUM

HAIGHT, District Judge.

Exxon Corporation ("Exxon") moves pursuant to Rule 24, F.R.C.P., to intervene as an additional defendant in this action commenced by New England Petroleum Corporation ("NEPCO") against the Federal Energy Administration ("FEA") and its administrator, Frank G. Zarb.

Plaintiff NEPCO opposes Exxon's intervention. The defendants, represented by the United States Attorney for this District, have taken no position.

Exxon prays for intervention as of right under Rule 24(a). In the alternative, Exxon asks for leave to intervene under Rule 24(b).

The Court concludes that Exxon is entitled to intervention as of right under Rule 24(a). If that were not the case, the Court would exercise its discretion and permit intervention under Rule 24(b).

## DISCUSSION

### The Litigation

On December 2, 1975 NEPCO commenced this suit against FEA and its administrator. NEPCO prayed for a declaratory judgment under 28 U.S.C. § 2201, and further necessary or proper relief under 28 U.S.C. § 2202. Jurisdiction is predicated upon the Federal Energy Administration Act of 1974, 15 U.S.C. § 761 *et seq.*, and in particular 15 U.S.C. § 766 and § 767; upon the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 *et seq.*; and upon the provisions of 28 U.S.C. § 1331. Venue is had in this Court under 28 U.S.C. § 1391(e)(4), NEPCO's principal place of business being New York, New York.

The original complaint prays that this Court declare void and without effect certain orders of FEA denying NEPCO's requests for regulatory relief. On May 18, 1976, NEPCO filed an amended complaint to allege further causes of action arising out of FEA's orders. NEPCO also attacks the validity of certain FEA regulations, insofar as they operate to deny NEPCO relief.

By notice dated May 18, 1976, NEPCO moved for summary judgment against FEA. That motion was adjourned, on consent of NEPCO and FEA, to the first Fri-

day after 45 days following service of NEPCO's Rule 9(g) statement in support of summary judgment.

It should also be noted that NEPCO obtained an order of this Court dated December 2, 1975, sealing the original complaint and enjoining the FEA and government counsel from disclosing its detailed allegations in respect of NEPCO's financial condition. Release of this information to the public, NEPCO contended, would result in "severe competitive disadvantage" and would "severely jeopardize its competitive viability" (affidavit of Jack E. McGregor, NEPCO's executive vice president, in support of the protective order).

To evaluate Exxon's motion to intervene, the precise nature of NEPCO's requests must be summarized, as briefly as circumstances permit.

NEPCO is an independent supplier of residual fuel oil to electric utilities in the eastern United States. "Residual fuel oil" is refined from crude oil. Until the late 1960's, NEPCO purchased most of its supplies of product from major oil companies. However, as NEPCO's sales increasingly exceeded supplies, and its customers requested a lower-sulfur-content residual fuel oil, NEPCO in 1968 entered into a venture with Standard Oil of California ("Socal") to build a refinery at Freeport in the Bahamas. NEPCO owns 65 per cent of the refinery and Socal 35 per cent. The refinery has a present capacity to process 500,-000 barrels of crude oil per day, yielding low-sulfur residual fuel.

It appears that NEPCO's Bahamas refinery was operating efficiently, with beneficial results to NEPCO's operations, when economic conditions and Congressional response to them intervened. In August, 1973, the Cost of Living Council, during Phase IV of the Economic Stabilization Program, established a two-tier pricing system for crude oil. Crude oil produced from domestic properties in production in 1972, in amounts not exceeding 1972 production levels ("old oil"), were price-controlled at $5.25 per barrel. Other forms of domestic production and imported crude oil sold at market prices. The two-tier pricing system was designed to curb inflation resulting from OPEC action; and to encourage development of new sources of domestic oil.

In November, 1973 Congress passed the Emergency Petroleum Allocation Act ("EPA Act"). The Foreign Energy Office ("FEO") and its successor agency FEA, charged with administering the Act, continued the two-tier pricing system first designed by the Cost of Living Council. The price differences are substantial. NEPCO alleges that "new" domestic crude oil, not subject to the $5.25 per barrel ceiling price, presently sells at about $13.20, while foreign crude oil sells at about $12.80.

In view of this price disparity, the source of a refiner's crude oil is of considerable economic significance. A refiner with access to price-controlled old oil is in a better marketing position than a refiner who must rely upon the more expensive "new" domestic or foreign crude oil. "The end result", NEPCO alleges, "was that marketers and consumers were paying significantly different prices to different refiners and suppliers for the same refined product" (original complaint, para. 3).

FEA, acting under its mandate to implement the objectives of the EPA Act,[1] addressed this situation by means of two regulatory devices. The first was the "Buy-Sell Program", 10 C.F.R. § 211.65, which became effective as modified on June 1, 1974. Under that program, each "small refiner" and "independent refiner" (as defined in the regulations) is entitled to purchase an amount of price-controlled old oil from certain domestic refiners which are neither "small" nor "independent". Refiners who are entitled to the benefits of this program are known as "refiner-buyers".

Secondly, in December, 1974 FEA promulgated the "Entitlements Program", 10

---

1. Those objectives include the "preservation of an economically sound and competitive petroleum industry" and the "equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices", 15 U.S.C. § 753(b)(1)(D), (F).

C.F.R. § 211.67, pursuant to which FEA issued monthly to each *domestic* refiner a number of "entitlements" equal to the refiner's proportionate share of the monthly national old oil supply. The operation of the program is described by NEPCO in its complaint (para. 25):

> "Refiners who actually processed more than their proportionate share of the national old oil supply were obligated to purchase entitlements for their excess supply from refiners with less than their proportionate share."

It will thus be seen that the Entitlements Program, reversing the mandate of the parable of the talents,[2] requires him that hath in abundance to pay him that hath not for the privilege.

NEPCO did not receive any benefits under either program. That is because the refinery in which NEPCO holds a majority interest is located in the Bahamas; consequently NEPCO is not regarded as a "domestic refiner" under the regulatory scheme. In that regard NEPCO may be contrasted with one of its competitors, Amerada Hess Corporation ("Hess"), whose refinery, while located in the Caribbean, is in the Virgin Islands, a United States territory.

NEPCO alleges, and there is no reason to doubt, that it suffered substantial economic adversity in relation to its competitors as a result of its inability to participate in these programs. NEPCO's competitors as large volume importers of residual fuel oil to the eastern United States included (in addition to Hess) Exxon; Asiatic Petroleum Corporation; and Texaco, Inc. Of that group, NEPCO alleges that Exxon's share of the market (24.49 percent) is the largest (complaint, para. 5).

NEPCO, alleging severe losses, cash flow problems, and worsening financial straits, applied to FEA for "exception relief" pursuant to 10 C.F.R. Part 205, Subpart D. The pertinent regulations permit an application:

> ". . . for an exception from a regulation, ruling or generally applicable requirement based on an assertion of serious hardship or gross inequity . . ." 10 C.F.R. § 205.50(a)(1)

Between February and August, 1975, NEPCO addressed a series of applications and appeals to FEA. FEA responded with a series of orders. It is not necessary to the decision on Exxon's motion to intervene to recite these applications and orders in detail. Suffice it to say that NEPCO sought (a) on a retroactive basis, an amount equal to the benefits it would have received if it had participated in both programs from the beginning; and (2) on a prospective basis, inclusion in both programs on an ongoing basis. FEA granted NEPCO partial relief in respect of the retrospective period, but denied other relief. NEPCO complains to this Court, and asks for the full measures of relief originally requested of FEA.

*Exxon's Motion to Intervene*

Exxon filed and served its motion to intervene on April 14, 1976, returnable on April 27. The motion was twice adjourned at NEPCO's request to June 1.

Exxon contends that, in the circumstances of the case, it is entitled to intervention as of right under Rule 24(a). That Rule provides in pertinent part:

> "*Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

Exxon argues that NEPCO's success in this litigation would have substantial adverse economic effects upon it. For example, Exxon calculates that if NEPCO is held entitled to retrospective relief under the Entitlements Program for just one of the

---

**2.** "For unto every one that hath shall be given, and he shall have abundance; but from him that hath not shall be taken away even that which he hath." *Matt.*, 25:29.

periods involved (August and September, 1975), Exxon will be obligated to purchase entitlements from NEPCO totalling about $850,000. In addition, Exxon says it will suffer continued economic damage if NEP-CO is granted what Exxon regards as "an unwarranted and unjustified participation in the Entitlements Program." These factors, Exxon contends, are sufficient to demonstrate that it has "an interest relating to the . . . transaction which is the subject of the action"; and that Exxon is "so situated that the disposition of the action may as a practical matter impair or impede" its ability to protect that interest. The Court agrees.

NEPCO does not really contest the potential impairment of Exxon's interests which is inherent in the litigation. It could not reasonably do so, in view of the mechanics of the FEA programs, where participating "have nots" are compensated at the expense of the "haves". In resisting intervention as of right under Rule 24(a), NEPCO contends (1) that Exxon's interests are adequately protected by the present defendant, FEA; and (2) that the motion to intervene is untimely. Neither objection is well founded.

With regard to the adequacy of representation of intervener Exxon by defendant FEA, the cases considering the general problem are legion. NEPCO cites a number of cases where adequacy of representation was found and intervention denied; Exxon cites cases illustrating the converse of the proposition. Each case turns on its own circumstances, and precedent may be less helpful than in other areas. However, certain principles emerge.

■ First, the Court is persuaded that in the light of the 1966 amendments to Rule 24, the burden of persuasion to demonstrate *adequacy* of representation falls on NEP-CO, the party opposing intervention. 7A Wright and Miller, *Federal Practice and Procedure* (1972), Civil § 1909 at p. 521.

Even if that is not so, Exxon is assisted by the Supreme Court's declaration in *Trbovich v. United Mine Workers,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972):

"The requirement of the Rule is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing *should be treated as minimal.*" 404 U.S. at p. 538, 92 S.Ct. at p. 636 n. 10 (emphasis added).

Second, a number of cases recognize that, in addition to the adequacy of the intervener's representation, it is important that the Court be fully advised of the merits contentions of interests that will be affected by its decision. See, e. g., *Bass v. Richardson,* 338 F.Supp. 478, 492 (S.D.N.Y.1971).

Without discussing all of the cases cited in the briefs, it is clear to this Court that Exxon would be adversely and permanently affected by an adjudication that NEPCO is entitled to the relief it seeks. The result of such an adjudication would be to benefit NEPCO, a newly arrived participant in the Buy-Sell and Entitlements Programs, at the expense of prior participants such as Exxon. The instant case is close on its facts to *Atlantic Refining Co. v. Standard Oil Co.,* 113 U.S.App.D.C. 20, 304 F.2d 387 (1962), which held that an association of independent refiners was entitled to intervene as of right in an integrated refiner's suit against the Secretary of the Interior for a declaration of invalidity of an import regulation favoring small refiners. The Court of Appeals said in part:

". . . in actions brought by a private person to have an order or regulation of an administrative agency adjudged invalid, the *res judicata* test for determining whether an applicant for intervention in the action will be bound by the judgment therein is unworkable and inappropriate. This, because, as we have shown in the instant case, a judgment invalidating the order or regulation will result in substantial injury to those deriving direct benefit therefrom and will be as final and conclusive to them as if they were bound by it under the doctrine of *res judicata* and no remedy will be open to them to redress the loss they will suffer because of such judgment." 304 F.2d at p. 394.

In *New York Public Interest Research Group, Inc. v. The Regents of the University of the State of New York,* 516 F.2d 350 (2d Cir. 1975), consumers brought an action to enjoin enforcement of a Regents-promulgated regulation prohibiting the advertising of the price of prescription drugs. A pharmaceutical society and three individual pharmacists sought intervention as of right. The district court denied intervention; the Second Circuit reversed *per curiam,* observing of the association:

> "With respect to the association of pharmacists, we hold that it has a sufficient interest to permit it to intervene since the validity of a regulation from which its members benefit is challenged. See *General Motors Corp. v. Burns,* 50 F.R.D. 401 (D.Hawaii 1970)." 516 F.2d at p. 352.

In *General Motors Corp. v. Burns,* cited with approval by the Second Circuit in *New York Public Interest Research Group,* associations of automobile dealers were held entitled to intervene as of right in *General Motors'* suit against the Governor of Hawaii to enjoin provisions of the state licensing act. The court based Rule 24(a)(2) intervention on the showing that "the outcome of this case may substantially affect" the dealers represented by the interveners, 50 F.R.D. at p. 404.

■ It is appropriate and desirable that full participation in this litigation be extended to one of NEPCO's competitors, whose interests the result will clearly affect. Exxon is in a position to address the issues from an industry, as opposed to a governmental, point of view. The Court cannot assume that those viewpoints are identical. On the contrary, before the FEA Exxon unsuccessfully urged the denial of all relief to NEPCO. That fact supports the inference that FEA's representation of Exxon's views "may be" inadequate.[3] While NEPCO argues that the Court may glean Exxon's position from a review of the FEA proceedings, no sound basis exists for limiting Exxon, which by all other criteria qualifies as an intervener of right, to the muted echoes of its prior presentation before another forum.

This Court holds that Exxon is entitled to intervention as of right under Rule 24(a)(2).

Alternatively, Exxon moves for permissive intervention under Rule 24(b)(2), which reads in pertinent part:

> "*Permissive intervention.* Upon timely application anyone may be permitted to intervene in an action: . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

■ For the reasons stated above, Exxon is entitled to intervention as of right. Were that not so, the Court would exercise its discretion in favor of permissive intervention. The arguments NEPCO addresses to the exercise of judicial discretion under Rule 25(b) are not persuasive.

NEPCO argues that Exxon's intervention at this time would unduly delay the litigation. No such concern need be felt, in the light of the particular circumstances of the case; see the discussion on the question of timeliness, *infra.*

■ NEPCO also vigorously contends that permitting Exxon to intervene would permit a competitor to examine NEPCO's confidential business information, currently under seal pursuant to the Court's order of last December. NEPCO views that potential development with such alarm that, in the words of its executive vice president:

> "Given NEPCO's financial situation, the possibility of disclosure of its confidential business information to Exxon or any of NEPCO's other competitors would compel NEPCO seriously to consider foregoing further prosecution of this action."

---

**3.** In *New York Public Interest Research Group, Inc. v. Regents of the University of State of New York, supra,* the Second Circuit observed that "there is a likelihood that the pharmacists will make a more vigorous presentation of the economic side of the argument than would the Regents." 516 F.2d at p. 352.

McGregor affidavit in opposition to intervention, para. 10.

In this regard, NEPCO expresses the concern that permitting Exxon to intervene could be viewed as "an invitation" to other oil companies which purchase or sell entitlements to intervene themselves. There are said to be 110 such companies.

The Court appreciates that NEPCO's sealed complaint contains sensitive information concerning its operations and financial position which it would prefer to shield from the gaze of a competitor. However, NEPCO instituted this suit of its own free will. It could have rested content with FEA's partial relief; it chose not to do so. NEPCO has every right to challenge FEA's action in court; but that right may carry with it certain obligations inherent in the nature of the litigation. The possibility, if not probability, of a motion by Exxon (or another competitor) to intervene was entirely foreseeable at the commencement of suit. The Court has concluded, for the reasons stated above, that Exxon is entitled to intervene. The question then arises as to what disclosure is necessary to make Exxon's participation in the litigation meaningful. We discuss that question below. It is sufficient to say at this juncture that the presence in the litigation of information NEPCO would prefer to keep confidential does not bar intervention by Exxon.

With respect to NEPCO's concern that other competitors may seek intervention, thereby causing further breaches in its wall of confidentiality, the question is premature at this time. However, without prejudging any subsequent applications for intervention, it would appear that, Exxon having been permitted to join the FEA as a defendant, other industrial competitors of NEPCO would have a considerably greater degree of difficulty in demonstrating that their interests were not adequately represented. (Conversely, if the burden of persuasion in respect of adequacy of representation falls upon NEPCO, it would have an easier time of demonstrating adequacy of representation in these circumstances.)

NEPCO attacks both intervention under Rule 24(a) and under Rule 24(b) on the basis that the motion is untimely. As to timeliness, it is true that Rule 24(a) requires that application for intervention be "timely"; so does Rule 24(b) in respect of permissive intervention. However, in contrast with Rule 24(b), where timeliness is most frequently a function of trial readiness and consequent delay if intervention is permitted, "something more than trial convenience" is involved where the intervener applies as of right under Rule 24(a). 3B *Moore's Federal Practice* (1975 ed.) Para. 24.13 at p. 24–522. In the case at bar, no depositions have been held or are contemplated. NEPCO is proceeding by way of summary judgment, and has granted FEA a minimum period of 45 days from May 18, 1976 to respond to the motion. NEPCO requested and received substantial adjournments of the return date of Exxon's motion. Exxon binds itself to meet whatever schedule may be set for presentation of the defendants' position.

In these circumstances, the Court declines to dismiss Exxon's motion as untimely, whether the pertinent test be that of Rule 24(b) or the more lenient yardstick of Rule 24(a).

*The Confidentiality Question*

As noted above, NEPCO is concerned about the exposure of confidential business information to Exxon as an intervener.

It is not clear from Exxon's papers on the motion whether it wishes to peruse that information. Exxon's reply memorandum (p. 18) observes that the Court has sealed the complaint and enjoined disclosure of its confidential contents; from that fact Exxon argues that NEPCO's concern for confidentiality "is not a proper ground for denial of Exxon's motion to intervene." That statement stops somewhat short of a disclaimer by Exxon of any interest in breaking the seal and reading the original complaint if it is entitled to intervene.

FEA, while taking no position on the merits of the motion to intervene, has submitted a memorandum "as an aid to the

Court." The memorandum points out that in proceedings before the FEA, a submitting party (such as NEPCO) is entitled to file a confidential copy of information with the FEA, deleting from the public copy data which, if viewed by third parties, "could jeopardize the petitioner's competitive position." FEA says in its memorandum:

"We suggest that the Court, whatever its determination on this motion, promptly adopt FEA procedures for the treatment of such arguably confidential information so as to avoid any possibility that uncertainties on this subject affect the progress of this litigation."

The precise thrust of FEA's suggestion is not entirely clear. If the suggestion is that Exxon should be denied access to NEPCO's confidential material, the question arises as to whether Exxon's position as Rule 24(a)(2) intervener in litigation entitles it to greater disclosure than its role as third-party participant before the FEA. No right to disclosure exists in the latter context; *quaere* as to the first. Of course, if Exxon does not desire to obtain direct access to the confidential information, no present problem arises.

There is also available the precedent of the Court's injunction against disclosure in respect of the present defendants and their counsel. Such restraints may also be imposed in respect of Exxon and its counsel.

The Court concludes that while Exxon is entitled to intervene, the implementation of that right, with particular reference to the confidentiality question, has not been sufficiently considered or briefed by the parties.

Accordingly counsel for Exxon are directed forthwith to settle an order, upon notice to NEPCO and FEA, granting the motion to intervene, and further containing such provisions as Exxon may deem appropriate to its implementation, particularly in respect of the confidentiality question. If the parties can agree on the form of the order, the Court will give it favorable consideration. If the parties cannot so agree, NEPCO and FEA are directed to serve and file counter-orders, and the Court will make a further ruling.