**UNITED STATES of America, Appellee,**

v.

**Demetrios PAPADAKIS and Joseph Novoa, Defendants-Appellants.**

Nos. 264, 275, Dockets 74–1847, 74–1956.

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 1974.

Decided Jan. 10, 1975.

Certiorari Denied April 28, 1975.

See 95 S.Ct. 1682.

Joseph I. Stone, New York City, for defendant-appellant Papadakis.

Arnold E. Wallach, New York City, for defendant-appellant Novoa.

Lawrence S. Feld, Asst. U. S. Atty., S. D. N. Y. (Paul J. Curran, U. S. Atty., on the brief), for appellee United States.

Before WATERMAN, OAKES and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

Joseph Novoa and Demetrios Papadakis appeal from judgments of conviction entered following a jury verdict rendered after a 13-day trial before Judge Wyatt.

The jury found Novoa guilty under count one of the indictment of conspiracy to obstruct justice in violation of 18 U.S.C. § 371, to commit narcotics offenses in violation of 21 U.S.C. §§ 173, 174 [now repealed] and 18 U.S.C. § 3,

and to obstruct communication of information to a federal investigator in violation of 18 U.S.C. § 1510. They also convicted him under count four of conspiracy to violate federal narcotics laws, 18 U.S.C. § 371, and, under counts five through ten, of substantive violations of 21 U.S.C. §§ 173, 174.[1]

Papadakis was originally charged under count four with conspiring with Novoa and others to violate the narcotics laws, but the charge was dismissed by the court before the case was submitted to the jury. The jury found Papadakis guilty under count seven of violating 21 U.S.C. §§ 173, 174; he was acquitted under count six, which charged him with the same offense on a different date.[2]

Novoa was sentenced to a five year term imprisonment on count one to run concurrently with concurrent terms of ten years imprisonment on counts four through ten. Papadakis was sentenced to a term of five years imprisonment to run concurrently with the consecutive five year terms of imprisonment which he is already serving for prior violations of the federal narcotics laws.

Appellants raise several different grounds for reversal on this appeal. We affirm.

The Government's case was presented primarily through the testimony of three witnesses: Carl Aguiluz, a former police officer and a co-conspirator; Frank Ramos, a co-conspirator and former co-defendant, who pleaded guilty to a lesser charge; and Salvador Boutureira, an admitted participant in the scheme. Viewing the evidence in the light most favorable to the Government, we find that the testimony of these and other witnesses revealed the following pattern of criminal conduct.

In April 1970 appellant Novoa was a police detective with the Special Investigations Unit ("SIU") of the Narcotics Bureau of the New York City Police Department. Working closely with Aguiluz and a third detective, Peter Daly,[3] Novoa was charged with the duty to investigate and uncover major narcotics offenses occurring within New York City and to apprehend the offenders.

### The "100 Kilo" Case

Late in the evening of April 14, while conducting surveillance in lower Manhattan, the three officers became suspicious of four persons, later identified as Emilio Diaz Gonzalez, Jose Luis Mulas, Jorge Rodriguez Arraya and Elena Risso, who were driving down Seventh Avenue, making sporadic stops along the way. The three detectives decided to follow the suspects' car, which eventually left lower Manhattan and proceeded up the West Side Highway, across the George Washington Bridge to the vicinity of Fort Lee, New Jersey. Near the Toll Gate Motel in Fort Lee, the detectives stopped the suspects' car.

After a brief altercation involving the local police and the manager of the Motel where it turned out the suspects were staying, the three detectives returned to New York City with the four suspects. In the car, Aguiluz asked Gonzalez for identification papers and, upon Gonzalez' production of three separate passports issued in three different names by three different countries, arrested him for falsifying documents. Aguiluz mentioned to Novoa and Daly that he feared the arrest was invalid, at which point Daly winked and said there was a gun beneath the seat of the suspects' car.

Having found a ground on which to arrest the suspects, the three detectives returned with them to the Sixth Precinct Station House, where the four were placed under arrest and locked in cells. On a ruse, Gonzalez obtained release

1. Counts two and three, charging Novoa as an accessory after the fact to violations of the narcotics law, 18 U.S.C. § 3 and 21 U.S.C. §§ 173, 174, and with substantive violations of the obstruction of justice statute, 18 U.S.C. § 1510, were severed on the Government's motion prior to submission to the jury.

2. A third defendant, Joaquin Nieves, was acquitted by the jury on count eight, which charged him with a violation of 21 U.S.C. §§ 173, 174.

3. Daly was indicted along with Novoa and Papadakis, but was a fugitive at the time of the trial.

from his cell and access to his personal belongings. He grabbed a piece of paper, stuffed it in his mouth and began to eat it. Despite the efforts of Novoa, Daly and Aguiluz to stop him, he was successful in swallowing the paper.

### The Seizure

The officers had reviewed the personal effects of the suspects several times, however, and, after examining the remaining papers, remembered that the swallowed paper had contained an address, 210 W. 19th Street, Apartment 4-F. Leaving Novoa at the Station House, Aguiluz and Daly took keys found on the suspects, went to the address noted, entered the apartment and searched it. They found two heavily locked closets which they could not open. They telephoned Novoa, who secured the aid of Detective John Kid, an expert in picking locks. When Kid had completed his task, the officers discovered that one closet contained a huge supply of what appeared to be heroin or cocaine, wrapped in South American newspapers, packaged in units of a kilo and a half-kilo. A field test showed that the contents were indeed narcotics of high purity; laboratory tests later showed that approximately 40 kilos of heroin and 60 kilos of cocaine had been seized from the apartment and turned over to the Property Clerk at the Police Department.

Not all of the seized narcotics was turned over, however.[4] While they were removing the packages from the closet, Daly suggested to Aguiluz, at a time when Kid was out of hearing, that they keep some narcotics for "flaking," that is, for planting on a person to create grounds for his arrest. Aguiluz agreed, and Daly placed five kilos—three of heroin and two of cocaine—in a small suitcase which he then placed in the trunk of his car. Novoa appeared at the apartment soon afterwards and was informed by his partners that they had set aside five kilos of narcotics for use in flaking. He said, "Fine."

It was then about 8:45 a. m. Aguiluz left the apartment to obtain a search warrant. After his return with the warrant, he, Novoa, Daly, and other officers of the SIU met with the press at the apartment. Later in the day, after returning to the Sixth Precinct Station House, Novoa, Aguiluz, Daly, and a fourth SIU officer, Sergeant Gabriel Stefania, split among themselves $1200 in cash seized from the four arrested persons.

### The Sale of Five Kilos of Narcotics by the Police Officers

About a week after the seizure, Aguiluz asked Novoa and Daly whether he could retain physical possession of the narcotics which they had set aside. They agreed, and Daly transferred the suitcase with the five kilos of heroin and cocaine to Aguiluz in Novoa's presence. Several weeks later, the three detectives met to decide what to do with the drugs. After some discussion, they decided to attempt to sell them. Aguiluz recommended that they use his brother-in-law, Boutureira, as an intermediary. Novoa and Daly agreed.

Soon afterwards, Aguiluz took a satchel containing the five kilos to the apartment of his brother-in-law in Greenwich Village. Boutureira agreed to try to sell the drugs. Boutureira then spoke with Ramos, owner of the Cafe Madrid. Ramos, after being given some samples, agreed to sell the drugs. It was agreed that Ramos would try to get $12,500 per kilo of heroin and $9,500 per kilo of cocaine. Ramos was to receive a commission of $500 per kilo sold.

Shortly thereafter, Ramos spoke with appellant Papadakis about a possible purchase, giving him a heroin sample previously supplied by Boutureira. Papadakis agreed to purchase a kilo of heroin for $12,500. The first sale was abor-

---

4. The total seized was 105 kilograms—the 100 kilograms turned over to the Property Clerk, which provided the press with a popular name for the case, and the five kilograms concealed by the three detectives.

ted when Papadakis failed to bring enough cash to pay for the heroin he had agreed to purchase, but on the next day, Papadakis, and an associate, Elissa Possas,[5] brought enough money. They gave the money to Ramos. He called Boutureira, who arrived at the Cafe and was shown the money. He was not introduced to Papadakis or Possas, but both were pointed out to him. Earlier, Boutureira had hidden a kilo of heroin in a brown paper bag under a board in a vacant lot at 13th Street and Eighth Avenue. Upon seeing that the money was all there, Boutureira told Ramos where the kilo was located and Ramos passed the information to Papadakis, who in turn signalled to a man standing outside the Cafe Madrid in a black leather jacket, who talked to Papadakis, and then left.

Boutureira had informed Novoa, Daly and Aguiluz of the scenario and the three were watching the Cafe Madrid. After they had seen the black-jacketed man enter and leave the Cafe, the three drove to a building opposite the parking lot where the heroin had been hidden. The black-jacketed man arrived on a motorcycle, found and took the heroin, left the lot, and threw the package into a taxi which had pulled up just as he was emerging from the lot. Both the taxi and the motorcycle then drove away. Soon afterwards, Possas received a telephone call at the Cafe after which she told Ramos that everything was all right. After Possas and Papadakis left the Cafe, Ramos turned the money over to Boutureira, less his $500 commission.

Boutureira then met Novoa, Daly and Aguiluz and the four proceeded to the Hotel Taft where they divided equally the $12,500 in proceeds from the sale of the kilo of heroin.

A few days later, Papadakis told Ramos that he would like to buy another kilo of heroin. Ramos contacted Boutureira, who, this time, placed the kilo in a subway locker at 14th Street and Eighth Avenue. After going to the Cafe, Bou-

tureira learned that Possas and Papadakis had not brought enough money. He refused to make the sale that day, but the next day he accepted $11,000, upon Ramos' assurance that the balance would be forthcoming. Boutureira told Ramos where the heroin was and gave him the key to the locker which Ramos gave to Papadakis. Shortly after Papadakis had left the Cafe with the key, Possas received a telephone call; she then told Ramos that everything was all right. This time, Boutureira took the money to an East Side apartment, where he hid it.

The next day, Papadakis telephoned Ramos to complain about the quality of the second kilo of heroin. A meeting was arranged between Papadakis and Boutureira, at which Papadakis arrived with an unnamed man, who identified himself as Papadakis' boss. Boutureira assured the man that he had not altered the heroin, at which point the man accused Papadakis of adulterating the narcotics and asked Boutureira to deal with him directly in the future, if he had more to sell. Sometime thereafter, Ramos gave Boutureira the $1000 due on the second purchase of heroin.

The Government's evidence also revealed that three more sales were made. One involved a transaction with co-defendant Joaquin Nieves, who was acquitted by the jury on a charge that he had purchased the kilo of heroin. According to the Government's evidence, Ramos also arranged this sale and, as in the previous sales, acted as the middle man holding the money until the purchaser secured the narcotics. When this was accomplished, he gave the money to Boutureira, minus his commission.

Boutureira now had a total of $24,000 from his second sale to Papadakis and his sale to Nieves. He got in touch with Aguiluz to arrange a meeting. Boutureira, Aguiluz, Novoa and Daly met in Boutureira's car, which was parked on 13th Street, near Sixth Avenue. At that meeting, Boutureira gave each of the

---

5. Possas was indicted along with Novoa and Papadakis, but was a fugitive at the time of the trial.

others his $6000 share of the proceeds of the two sales.

The last two sales, of the two kilos of cocaine, were made by Boutureira to co-conspirator Lorenzo Cancio. The first sale was of a half-kilo, which Boutureira gave Cancio on consignment. Ramos again acted as the middle man. On the last sale, of one-and-one-half kilos, Boutureira dealt with Cancio directly. Cancio gave Boutureira a total of $18,000, which Boutureira later divided equally with Novoa, Aguiluz and Daly.

The evidence also showed that while Aguiluz was on vacation, Novoa and Daly located the apartment of Elena Risso, one of the four persons originally arrested on April 15. In searching her apartment, the two detectives found $5000 in cash, which they split three ways, giving Aguiluz his share upon his return from vacation.

The Government also introduced testimonial evidence which indicated that Novoa, Daly and Aguiluz had entered into discussions with the attorney for the four suspects arrested in the "100 kilo" seizure to fix the case in return for a bribe. Through Nicholas DeStefano, a bail bondsman, the lawyer, Michael Santangelo, got in touch with SIU Detective Nicholas Lamattina, who in turn spoke to Daly and then acted as a middle man in the ensuing negotiations. Novoa, Daly and Aguiluz met with Lamattina, telling him that Santangelo would have to pay the $5000 balance of a former bribe before they would deal with him on the "100 kilo case." After payment was arranged and completed, the three detectives told Lamattina that they would need $125,000 to fix the case, an amount which Santangelo rejected out of hand. The possibility of further negotiations was ended when Santangelo was discharged by his clients.

The Government also introduced other evidence, some of which appellant Novoa challenges as irrelevant and prejudicial. Testimony was received which demonstrated that on several occasions, prior to, during, and after the period of the conspiracies charged in the indictment, Novoa, Aguiluz, Daly and other members of the SIU retained and divided amongst themselves money seized in the course of various narcotics investigations. Five separate incidents involving such practices were revealed through testimony. In four instances, this evidence showed a relatively simple pattern. If cash was found on the person of a narcotics dealer during an arrest, or on the premises where the arrest was made, SIU detectives including Novoa would later divide the cash among the police officers who participated in the arrest.

More extensive testimony was elicited concerning the fifth incident, involving the arrest of Raoul Leguizamon a narcotics dealer, and Alberto Diaz, an associate, following the use of information obtained through an illegal wiretap installed on the telephone in Leguizamon's room at the Hotel Taft. $40,000 in cash found in his room after the arrest had been divided among Novoa and others. Afterwards, Leguizamon and Diaz hired Michael Santangelo as their lawyer. Through Lamattina, Santangelo arranged to give a bribe to Novoa, Daly and Aguiluz in the amount of $25,000. The $5000 "debt" which the detectives demanded that Santangelo pay before they would talk to him about a bribe in the "100 kilo case" represented the balance of the Leguizamon bribe.

Finally, the Government introduced evidence to show that a federal investigation into drug importation from South America had been begun in December 1969 after the arrest at the Hotel McAlpin of several South Americans who were alleged narcotics smugglers. Eventually, Albert Seeley, the Customs Service agent in charge of the federal investigation, learned that the persons arrested at the McAlpin had ties to the four persons arrested by detectives Novoa, Daly and Aguiluz on April 15 in the "100 kilo case." Customs agents approached the SIU to inform them of the connection and of the pending federal investigation. The Government's evidence revealed in some detail the course of Seeley's investigation following his initial

contact with the SIU. It showed that Novoa, Daly and Aguiluz were aware that a federal investigation was pending into the narcotics importation network that had originally brought into this country the 105 kilos of heroin and cocaine seized by them on April 15.

## I

Appellant Novoa seeks reversal of his conviction on the two conspiracy counts (one and four) and on counts five through ten of the substantive counts. He contends that he was denied a fair trial because the Government introduced evidence of criminal activity not charged in the indictment. Specifically, Novoa contends that evidence showing that on several occasions he and other SIU detectives retained and divided money seized from persons they had arrested was prejudicial. The Government asserts that this evidence was admissible to show that appellant engaged in a pattern of conspiratorial criminal conduct, of which the more limited conspiracy to obstruct federal justice charged in count one was a part.

This court has held that evidence of other criminal offenses is admissible if it is relevant for some purpose other than merely to show a defendant's criminal character, provided that its potential for prejudicing the defendant does not outweigh its probative value. United States v. Deaton, 381 F.2d 114, 117 (2 Cir. 1967); United States v. Bozza, 365 F.2d 206, 213 (2 Cir. 1966).

Obviously in casting the rule in such broad terms we have gone beyond the ancient learning which limited proof of other criminal acts to special categories of matters in issue. It was hardly more than a generation ago that an assiduous law student could recite, almost in the manner of a catechism, the elements such evidence could be used to prove. These familiar molds were 1) knowledge 2) intent and 3) design. 2 Wigmore, On Evidence §§ 300–04 (3d ed. 1940). The rule was rather an easy one to administer. Thus a trespass larceny would ordinarily not admit of proof of similar larcenies. A larceny by trick and device would, on the other hand, admit such proof, for in that case, the alleged criminal act having been proved, the issue still to be proved was intent. There it was thought that although proof of similar offenses would indeed show the defendant to be a knave, it was only right for the jury to know that it was his practice to commit what appeared to be innocent acts with intent to defraud. Logically, most laymen would probably think the distinction of the two examples too subtle, and that common sense suggests that a man who had once committed a burglary is more likely than the ordinary person to be guilty of the burglary for which he is on trial. The argument for exclusion was not based on a lack of logical relevance, however. The evidence was excluded for fear that an innocent defendant might be convicted merely because he had committed a crime in the past.

During the past few decades, the exceptions allowing admission of proof of prior criminal acts have grown in number to the point that they have engulfed the rule. Despite the efforts of defense lawyers to stem the tide, the flow has been constant. See e. g. United States v. Knohl, 379 F.2d 427, 438–439 (2 Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967); United States v. Bozza, supra, 365 F.2d at 212–214; United States v. Kahaner, 317 F.2d 459, 471–472 (2 Cir.), cert. denied sub nom. Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963). Thus, we are by now firmly wedded to the inclusory form of the rule, that evidence of other crimes is admissible, if relevant, except when offered solely to prove criminal character. United States v. Deaton, supra, 381 F.2d at 117. The task of deciding when the exception prevails remains whatever the rule.

On the present appeal, however, it cannot be said that the evidence was offered solely to prove criminal character. The charge of conspiracy to commit criminal acts always requires proof of a course of conduct that will circumstan-

tially prove the corrupt agreement. There is no more convincing proof to a jury than that of a pattern of conduct which unfolds before their eyes.

■ The arrest of suspects, the appropriation of their cash, the division of the spoils among the officers, the taking of part of the contraband for "flaking" or sale, the solicitation of bribes to conceal the evidence—all these revealed a pattern of conduct engaged in by Novoa and others "of which the crime charged [was] a part." United States v. Blassingame, 427 F.2d 329, 331 (2 Cir. 1970), cert. denied, 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971); see United States v. De Sapio, 435 F.2d 272, 280 (2 Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971). The crime charged in this case was a conspiracy to obstruct the lawful operations of the Government and to sell some of the narcotics involved. The evidence would have been properly admitted even in a jurisdiction that still adheres to the "design" exception. Indeed, the evidence showed the existence among a group of SIU officers of a broader conspiracy to obstruct justice, of which the conspiracy charged against Novoa in count one of the indictment was only a part. United States v. Cohen, 489 F.2d 945, 949 (2 Cir. 1973).

Further, at least one of the incidents, that involving the arrest of Leguizamon at the Hotel Taft, was directly connected with acts charged in the indictment, since it was related to the bribery negotiations over the "100 kilo case." See United States v. Deaton, supra, 381 F.2d at 118.

■ Appellant asserts that when evidence of similar criminal acts is admitted, the trial judge should instruct the jury as to the limited purpose for which the evidence has been received. See United States v. Colasurdo, 453 F.2d 585, 591 (2 Cir. 1971), cert. denied, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972); United States v. Klein, 340 F.2d 547, 548–549 (2 Cir.), cert. denied, 382 U.S. 850, 86 S.Ct. 97, 15 L.Ed.2d 89 (1965). In this case, the judge neither cautioned the jury when the evidence was received nor charged the jury on the matter. However, appellant's counsel at trial at no time objected to the testimony about these acts as it was elicited, nor did he request a charge on the limited purpose for which the evidence had been received. Failure to raise these issues in the court below precludes review here. United States v. Bozza, supra, 365 F.2d at 214; United States v. Indiviglio, 352 F.2d 276 (2 Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). In any event, on our analysis, the evidence was itself probative of the conspiracy charged in the indictment.

## II

■ Appellant Novoa's second basic argument for reversal is that conspiracy counts one and four were multiplicitous and that only a single conspiracy should have been charged. This is the converse of the more usual claim that a number of conspiracies were erroneously charged in a single count.

Count one of the indictment charged Novoa and Daly with conspiracy to obstruct federal investigations into narcotics offenses by withholding evidence and assisting narcotics offenders to violate 21 U.S.C. §§ 173, 174, and to violate 18 U.S.C. § 1510 as well as 18 U.S.C. § 3. Count four charged Novoa, Daly and others with conspiracy to violate 21 U.S.C. §§ 173, 174 by dealing in narcotics. Certain of the overt acts performed in furtherance of each conspiracy were identical, notably the seizure and concealment of five kilograms of narcotics and the subsequent sale of the narcotics.

Appellant contends that a single agreement and a single "course of conduct" were involved in the activity underlying both counts and that there should not have been two conspiracy counts. He relies upon United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952), to forward his point. Universal C.I.T. has no bearing. That case involved a prose-

cution for violation of the minimum wage law. There the question was whether Congress intended each underpayment to an employee to constitute a separate crime. The court found that Congress had intended to punish "a course of conduct"—the underpayment of employees—rather than individual instances of underpayment. Id. at 224.

■ That particular necessity to examine whether single acts were punished as violations by the statute has no bearing on a conspiracy charge where the essence is, as is so often said, the agreement itself. While it is unusual so to charge, there is no reason why people cannot enter into two separate criminal agreements more or less at the same time. See United States v. McKnight, 253 F.2d 817, 819–820 (2 Cir. 1968). If they do, they come within the joinder rule, F.R.Cr.P., Rule 8, subject to severance in the interest of justice. There is no occasion for us to consider whether consecutive sentences could have been given for the two overlapping conspiracies, for that was not done. Cf. Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). If at the end of the trial only one conspiracy had been shown, appellant could not have been prejudiced by that circumstance, for the first count was broad enough to encompass the fourth count. When a given set of facts may be read to support conviction for either one or two conspiracies, the Government may charge a defendant with two "to meet the different interpretations which might be placed on the evidence by the jury." United States v. McKnight, *supra*, 253 F.2d at 819.

### III

Appellant contends that the Government's proof failed to show that he had the requisite intent to conspire to violate federal law. The argument is based on the familiar United States v. Crimmins rule, 123 F.2d 271 (2 Cir. 1941). There it was held that a defendant could not conspire to transport stolen securities in interstate commerce without specific knowledge that the securities would be moving in interstate commerce. Appellant argues that the Government did not demonstrate that he knew his acts might bring him within the criminal jurisdiction of the United States. See Ingram v. United States, 360 U.S. 672, 677–679, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959).

In view of appellant's position as a police officer in a special narcotics unit and his official duty not to conceal evidence from federal authorities, his broad contention that he had no knowledge that he might be committing crimes within the federal jurisdiction by stealing evidence and concealing narcotics crimes borders on the frivolous.

Narcotics offenses present an unusual situation where state and federal violations may be the result of the same act. From the Act of Feb. 9, 1909, ch. 100 § 2, 35 Stat. 614, onward, the federal jurisdiction has been made to apply to what are also state crimes. Even the requirement that the defendant know that the narcotic drugs were imported, an original basis for federal jurisdiction, has now been dropped. 21 U.S.C. § 841 (1970). While there may be specifics that differ in the respective statutes, the commonalty of state and federal offenses has led to the formation of joint task forces which include New York City police and federal agents working together. Since narcotics dealers work in rings, information about one suspect may lead to the breaking of an entire combination. That such information is of importance to federal authorities is known by every police officer, especially if he is engaged in the detection of narcotics violations.

■ In this case appellant knew that there was a federal investigator named Seeley, whom he actually met. Agent Seeley was seeking information about the connection between some South Americans whom federal agents had arrested at the Hotel McAlpin for narcotics smuggling and the people involved in appellant's arrests in the "100 kilo case" some four months later. When federal agent Seeley learned of a connection be-

tween the two arrests, he spoke to SIU officers, including Novoa.

Appellant gave no cooperation and concealed the fact that he and his fellow police officers in the unit were holding "seized" narcotics for sale and that they had taken cash from persons arrested which could have been evidence in a federal investigation. Moreover, they had been dealing with representatives of narcotic defendants to take money for suppressing evidence.

The specific intent to defraud the United States by obstructing and hindering federal law enforcement agencies in the investigation and prosecution of violations of the federal narcotics laws was adequately proved.

Appellant Novoa raises a more serious question of whether the Government proved that he intended to violate 18 U.S.C. § 1510,[6] as part of the conspiracy charged in count one.

On the restricted view of Section 1510 taken by the Fifth Circuit in United States v. Cameron, 460 F.2d 1394 (1972) and the application of the *Crimmins* rule, no specific intent to inhibit or prevent "any person" from communicating information relating to violations of federal law to a federal criminal investigator was proved, since under *Cameron* "any person" could not be one of the conspirators themselves. The Government did not prove that appellant and his co-conspirators influenced another person not to give information to federal investigators like Seeley.

We need not decide whether we agree with the Fifth Circuit view of Section

1510. Cf. United States v. Lippman, 492 F.2d 314, 316 (6 Cir. 1974).[7]

■ Where a conspiracy has multiple objectives, a conviction will be upheld so long as evidence is sufficient to show that an appellant agreed to accomplish at least one of the criminal objectives. United States v. Grizaffi, 471 F.2d 69, 73 (7 Cir. 1972), cert. denied, 411 U.S. 964, 93 S.Ct. 2141, 36 L.Ed.2d 684 (1973); United States v. Tanner, 471 F.2d 128, 140 (7 Cir. 1972); United States v. Mack, 112 F.2d 290 (2 Cir. 1940).

■ The only caveat in such cases is that an overwhelming amount of evidence relevant only to the unproved part of the conspiracy may have prejudiced the jury. Here we find the evidence admitted was relevant to prove the charge of obstruction of justice, which we sustain. Most of the evidence introduced in support of count one revealed a conspiracy to obstruct justice and hinder the operation of lawful federal government functions in violation of 18 U.S.C. § 371. A conspiracy to obstruct justice under that section includes "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." Haas v. Henkel, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910). The facts outlined above show that appellant agreed to impede such lawful function. See Dennis v. United States, 384 U.S. 855, 861, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); United States v. Johnson, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); United States v. Jacobs, 475 F.2d 270, 283 (2 Cir.), cert. denied sub nom. Lavelle v. United States, 414 U.S. 821, 94

6. Section 1510 reads in relevant part:

"§ 1510. *Obstruction of criminal investigations*

"(a) Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator;

"Shall be fined not more than $5,000, or imprisoned not more than five years, or both.

"(b) As used in this section, the term 'criminal investigator' means any individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations of or prosecutions for violations of the criminal laws of the United States."

7. The Government severed count three, which charged the substantive violation of Section 1510, and it was not considered by the jury.

S.Ct. 116, 38 L.Ed.2d 53 (1973); United States v. Peltz, 433 F.2d 48, 51–52 (2 Cir. 1970), cert. denied, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971). That is enough to uphold the verdict on the first count. United States v. Jacobs, *supra.*

## IV

Appellant Novoa raises a different point in connection with his conviction under counts five, nine and ten of the indictment.[8] He contends that the Government failed to prove that he knew the cocaine had been illegally imported, as required by 21 U.S.C. §§ 173, 174. He contends further that the trial judge should not have charged the statutory presumption embodied in section 174, deeming unexplained possession of a narcotic drug sufficient to justify conviction. He objects further to the court's statement in its charge of the Government's contention that the fact that the narcotics when originally discovered were wrapped in South American newspapers and that the persons arrested in the 100 kilo case were all South Americans evidenced illegal importation. We find these arguments unpersuasive.

In Turner v. United States, 396 U.S. 398, 418–419, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), the Supreme Court held that a defendant found to possess less than one gram of cocaine[9] could not be presumed under section 174 to know that the drug had been illegally imported. The Court reasoned that sufficient amounts of cocaine were legally imported or produced in this country to make the presumption invalid in that context. It explicitly declined to decide whether the presumption would operate if a larger amount of cocaine was possessed. 396 U.S. at 419 n. 39, 90 S.Ct. 642.

Since *Turner,* this Circuit has held that the presumption will be validly applied when large amounts of cocaine are involved. United States v. Gonzales, 442 F.2d 698 (2 Cir. 1970) (en banc), cert. denied, 404 U.S. 845, 92 S.Ct. 146, 30 L.Ed.2d 81 (1971). In *Gonzales,* we refused to adopt a *per se* rule but held that in the proper factual context, possession of slightly more than one kilogram of cocaine may be deemed to indicate knowledge of illegal importation. 442 F.2d at 709. The rule has been followed in subsequent cases. United States v. Nathan, 476 F.2d 456, 461 n. 15 (2 Cir.), cert. denied, 414 U.S. 823, 94 S.Ct. 123, 38 L.Ed.2d 56 (1973); United States v. Vargas, 443 F.2d 901, 903 (2 Cir. 1971).

In this case, the evidence indicates not only that the presumption should have been validly entertained by the jury, but also that the jury could have found actual knowledge of illegal importation. The two kilos of cocaine involved in the indictment had been taken from a total supply of 62 kilos of cocaine, which had been found stored with 43 kilos of heroin. The narcotics were wrapped in South American newspapers and had been located through information seized from four South Americans, who possessed South American identification papers. Given these circumstances and Novoa's knowledge of them, the evidence was sufficient to support the jury's verdict.

Finally, Novoa asserts that the District Court's modified Allen charge was improper in that it reminded the jury that the time, effort and money of both the defendant and the Government had been expended in the trial. Such a charge is not radically different from those explicitly approved in prior decisions of this court. See e. g., United States v. Hynes, 424 F.2d 754, 756–757 n. 2 (2 Cir.), cert. denied, 399 U.S. 933, 90 S.Ct. 2270, 26 L.Ed.2d 804 (1970). Indeed, the same charge has been used previously by Judge Wyatt and was approved, without the court's noting its

**8.** Count five charged Daly and Novoa with receiving five kilograms of heroin and cocaine. Counts nine and ten charged Daly, Novoa and Ramos with the two transactions, each involving one kilogram of cocaine.

**9.** Defendant had approximately 15 grams of a mixture of cocaine and sugar, 5% of which was cocaine.

substance, in United States v. Zane, 495 F.2d 683, 692 (2 Cir. 1974), petition for cert. denied, 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).

V

Appellant Papadakis challenges his conviction upon the ground that a severance should have been granted under F.R.Crim.Pr. Rule 8 [10] and subsequently during trial under Rule 14.[11]

The indictment, as we have seen, joined as offenses in count one a multiple purpose conspiracy, 1) to defraud the United States by obstructing federal law enforcement agencies in investigating narcotics law violations, 2) to obstruct the communication of such information to a criminal investigator and 3) to commit substantive crimes involving the possession, concealment and sale of narcotics; together with a second conspiracy count (count four) charging only the third element of the first conspiracy. To these two conspiracy counts were also joined various substantive counts against Daly and Novoa (counts two, three and five), these two defendants with Ramos and Nieves (count eight), these two defendants with Ramos alone (counts nine and ten), and finally two substantial counts charging appellant Papadakis with the purchase and sale of heroin on two occasions with Daly, Novoa, Ramos and Possas (counts six and seven).

Appellant Papadakis was not named as a defendant in the conspiracy charged in count one though he was named in one of the overt acts. He was named as a defendant in the conspiracy in count four, but the count was dismissed as to him before the case was submitted to the jury. He was convicted on count seven for purchasing narcotics, but was acquitted on count six. He argues that count one should have been tried separately from counts four through ten.

We note first that we are met here with a claim of error by an appellant whose concurrent five year sentence in this case is merely repetitive of the consecutive five year sentences of imprisonment he had previously been sentenced to by other judges under convictions which have long since become final. In a sense no serious harm resulted from his third conviction.

On the other hand, there may be a certain *amour-propre* among some narcotics violators in pressing their appeals to which we give heed, in view of the hypothetical possibilities discussed in Benton v. Maryland, 395 U.S. 784, 790–791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). We shall consider the matters raised as if they were more meaningful.

We consider first the claim that there was an improper joinder under Rule 8. That rule prescribes two tests for joinder. 8(a) relates to joinder

---

**10.** Rule 8 reads:

"*Joinder of Offenses and of Defendants*

"(a) *Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

"(b) *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separate-ly and all of the defendants need not be charged in each count."

**11.** Rule 14 reads:

"*Relief from Prejudicial Joinder*

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial."

of offenses, while 8(b) relates to joinder of defendants. However, when a defendant in a multiple-defendant case challenges joinder of offenses, his motion is made under 8(b) rather than 8(a). See, e. g., United States v. Bova, 493 F.2d 33, 35 (5 Cir. 1974). The question asked by 8(b) is whether the co-defendants "participated . . . in the same series of acts or transactions constituting an offense or offenses."

While the United States Attorney should be careful not to "overjoin" where there is a diversity of offenses as well as diverse defendants, see Cupo v. United States, 123 U.S.App.D.C. 324, 359 F.2d 990 (1966), cert. denied, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967), we do not believe that he overstepped the mark on the face of this pleading. The indictment charged all defendants with conspiracy to violate and substantive violations of 21 U.S.C. §§ 173, 174, and the indictment stated that certain of the overt acts committed in furtherance of the conspiracy charged in count one also furthered the conspiracy charged in count four.

■ In any event, no motion with respect to Rule 8 was made before trial as required by Rule 12(b), and we cannot consider the alleged misjoinder on the face of the indictment as such. United States v. Daniels, 141 U.S.App.D.C. 223, 437 F.2d 656, 661 (1970); Cupo v. United States, supra, 359 F.2d at 993.

That is not conclusive, however, where there has been a severance request at the trial. In such event Rule 14 picks up where Rule 8 leaves off. It provides, in simple terms, that "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses or of defendants . . . the court . . . may grant a severance of defendants or provide whatever other relief justice requires."

Papadakis argues strongly that the dismissal of the conspiracy count against him before submission to the jury shows that the joinder was improper to begin with. Standing alone, the Supreme Court has rejected it as a conclusive point. Schaffer v. United States, 362 U.S. 511, 515–516, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). The Court did caution, however, that "in such a situation" the trial judge has a continuing duty to grant a severance if prejudice appears, and must be "particularly sensitive to the possibility of such prejudice." 362 U.S. at 516, 80 S.Ct. at 948. Yet it is not enough for appellant simply to show he might have a better chance for acquittal in a new trial. He must show substantial prejudice and that the trial judge abused his discretion in refusing to sever. United States v. Borelli, 435 F.2d 500, 502 (2 Cir. 1970), cert. denied, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971); accord, United States v. Calabro, 467 F.2d 973, 987 (2 Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973); United States v. Projansky, 465 F.2d 123, 138 (2 Cir.), cert. denied, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972).

■ The contention here is that appellant was tarred with the same brush as Novoa and his cohorts, concerning whose corruption there was much evidence that had nothing to do with appellant. We cannot ascribe such a spillover to the joint trial for the very reason that Papadakis was obviously not a "crooked cop" and clearly had no connection with their corrupt activities. United States v. DeSapio, supra, 435 F.2d at 280. Judge Wyatt was careful to charge with respect to each witness who testified only against Novoa that the testimony was not admitted against appellant. And the prosecutor was careful enough not to join appellant in the count one conspiracy which dealt with the obstruction of justice theme as well as the narcotics theme.

It has been doubted in similar contexts that a jury can compartmentalize its collective mind and reject what it has heard. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Jackson v. Denno, 378 U.S. 368, 388–389, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring). Yet that is what most likely happened here.

The jury did not convict Papadakis on both substantive counts with which he was charged. They acquitted him on the count which involved the transaction with the man in the black leather jacket, and convicted him on the other count involving the subway locker. This indicated, in a positive way, a refusal by the jurors to accept guilt by association as the touchstone in their deliberations. See United States v. Jordan, 399 F.2d 610, 615 (2 Cir.), cert. denied, 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968); Fernandez v. United States, 329 F.2d 899, 906 (9 Cir. 1964).

Moreover, Nieves, another alleged buyer, was acquitted on the substantive count with which he was charged. And Nieves stood to be tarred as much as did Papadakis. The result was a demonstrable tribute to Judge Wyatt's thoughtful management of the trial and the jury's careful deliberation, untrammeled by prejudice.

We have considered the other points raised and find them without merit.

Affirmed.