UNITED STATES of America, Appellee,

v.

Charles GOLDBERG and Pocono International Corporation, Defendants-Appellants.

No. 349, Docket 75–1229.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1975.

Decided Nov. 26, 1975.

Gideon Cashman, New York City (Joel M. Eichengrun, Pryor, Cashman & Sherman, New York City, of counsel), for appellants.

Bart M. Schwartz, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for the S.D. N.Y., Anne Sidamon-Eristoff, Eugene Neal Kaplan, John D. Gordan, III, John C. Sabetta, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before MANSFIELD, TIMBERS and GURFEIN, Circuit Judges.

MANSFIELD, Circuit Judge:

Pocono International Corporation ("PIC") and Charles Goldberg, its principal officer and stockholder, appeal from judgments entered by the United States District Court for the Southern District of New York, Charles L. Brieant, Jr., *Judge,* finding them guilty of mail fraud, 18 U.S.C. § 1341 (7 counts) and of violation of the relatively new Interstate Land Sales Full Disclosure Act ("Act"), 15 U.S.C. § 1701 *et seq.* (13 counts). The latter statute, as its title indicates, was enacted in 1968 in order to prevent abuses and deceptive practices, including high-pressure and fraudulent sales techniques, in interstate sales of land.[1] The Act prohibits a land developer from using interstate facilities to sell or lease a lot in any land subdivision unless (1) the lot has first been registered with the Department of Housing and Urban Development ("HUD"), which can be accomplished by the developer's filing with it a "Statement of Record" containing prescribed details and waiting until the Statement has become "effective,"[2] and (2) a printed "Property Report," which is in the nature of a prospectus containing a condensed version of the Statement of Record and supporting exhibits, has been furnished to the prospective purchaser. In addition to being found guilty of mail fraud in the sale of lots, appellants were convicted of selling 6 lots which had not been registered as required by 15 U.S.C. § 1703(a)(1),[3] and of selling 7 lots in violation of the general fraud provisions of

---

1. 113 Cong.Rec. 315 (Jan. 12, 1967).

2. A Statement of Record filed with HUD becomes effective when any deficiencies noted by HUD have been corrected by the registrant or, where no such deficiencies are noted, upon the expiration of 30 days after filing.

3. "§ 1703. *Prohibitions relating to sale or lease of lots in subdivisions; voidability of contracts or agreements*

"(a) It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments or transportation or communication in interstate commerce, or of the mails—

"(1) to sell or lease any lot in any subdivision unless a statement of record with respect to such lot is in effect in accordance with section 1706 of this title and a printed property report, meeting the requirements of section 1707 of this title, is furnished to the purchaser in advance of the signing of any contract or agreement for sale or lease by the purchaser; and * * *."

15 U.S.C. § 1703(a)(2)(B).[4] Finding no reversible error, we affirm the convictions on all counts.

The record, viewed in the light most favorable to the government, as it must be on this appeal, *United States v. Castellana,* 349 F.2d 264, 267 (2d Cir. 1965), *cert. denied,* 383 U.S. 928, 86 S.Ct. 934, 15 L.Ed.2d 847 (1966), reveals that PIC was incorporated by Goldberg and others in or about early 1970 for the purpose of acquiring, developing and subdividing some 820 acres known as Hickory Run Forest ("HRF") in the Pocono Mountains in Penn Forest Township, Carbon County, Pennsylvania (the "Township"). At all relevant times Goldberg owned at least 50% of PIC's issued stock and was one of PIC's principal officers; at one time he was the company's president. The area to be exploited was divided into eight sections which were mapped, cleared and developed in piecemeal fashion, section by section, with certain sections first being registered with HUD by PIC's attorney in 1971 and early 1972. The sale of lots was handled exclusively by PIC's agent, Sellamerica, Inc., the principal officer of which, Rick Ebenstein, was also a PIC officer.

The lots which were the subject of the indictment were located in Sections 1–4 of HRF, for which a Statement of Record was filed with HUD on July 18, 1972, by Norman Failla, a broker employed by Goldberg on behalf of PIC for that purpose. Under the Act and HUD regulations, since HUD did not inform the registrant of any deficiencies within 30 days, the Statement became effective on August 17, 1972.[5] Prior to August 17,

however, PIC made sales of unregistered lots to the customers named in six of the counts in the indictment; four of these sales were made even before the July 18 filing. The sales were as follows:

Jordan, June 4 (Count 16); Delgado, June 25 (Count 18); Arella, July 8 (Count 20); DiMeglio, July 3 (Count 26); Cancro, July 18 (Count 30); and Perri, July 18 (Count 32).

In each instance the prospective customer, after being solicited by PIC's selling agent (Sellamerica) by telephone or in person, drove on interstate roads to HRF, was shown the lots by a salesman, signed a PIC purchase agreement, made a down payment, and executed a loan agreement. Thereafter interstate facilities, including mails and telephone, were used to complete the purchases and pay off the loans.

Aside from the fact that the lots named in the indictment were not effectively registered when sold, some of the purchasers of these lots (Jordan, DiMeglio and Arella) were not furnished with a Property Report before making their purchases. The sales of unregistered lots alleged in the indictment furthermore represented but a small portion of the total number of lots sold prior to August 17, 1972, the date when the registration became effective. Approximately 125 additional unregistered lots were sold by PIC, of which some 115 were sold prior to the filing of the Statement of Record.

As a PIC officer Goldberg handled correspondence relating to sales of many of the unregistered lots, including those named in the indictment, and engaged in

<hr>

4. "(a) It shall be unlawful for any developer or agent, . . .

*    *    *    *    *    *

"(2) in selling or leasing, or offering to sell or lease, any lot in a subdivision—

*    *    *    *    *    *

(B) to obtain money or property by means of a material misrepresentation with respect to any information included in the statement of record or the property report or with respect to any other information pertinent to the lot or the subdivision and upon which the purchaser relies, or . . . ."

Six of the seven lots which were the subject of the fraud counts were also the basis of the non-registration counts.

5. Due to oversight HUD allowed the 30-day period to expire before it on August 17, 1972, mailed a letter to PIC noting deficiencies. Thereafter the defendants and HUD proceeded to negotiate correction of the deficiencies, apparently unaware that the Statement had become effective.

activities from which it could fairly be inferred that he knew at the time of the sales that the Statement of Record for the lots, sold either had not yet been filed or was not yet effective. For instance, while sales of the lots were already being negotiated, he was still arranging for the procurement of maps and other records needed to file the Statement. Furthermore, after sales had begun he arranged for the issuance of a check to Failla for the filing fee and authorized Failla to obtain the signature of PIC's president on the Statement to be filed.

The fraud counts (both those charging violation of the mail fraud statute and those charging violation of the Interstate Land Sales Full Disclosure Act) were based on appellants' representations to seven named purchasers regarding the type of governmental approval required for installation of the on-site septic tank systems needed by the purchasers on the lots sold by PIC. Appellants advised purchasers that they would be able to dispose of household sewage by constructing on the lots septic tank systems that would be approved by the Township. This representation was made in a Statement of Record for earlier-registered sections, signed by Goldberg and incorporated in the later Statement filed for Sections 1–4, which encompassed the lots sold to purchasers named in the indictment.[6] It also appeared in the Property Report distributed to some purchasers.[7] Three purchasers were informed orally by PIC's sales agent (Sellamerica) that they would not have any trouble installing septic tanks in lots purchased by them. The materiality of these representations lay in the fact that if sewage systems approved by the local Township could be installed the matter would be routine, relatively trouble-free and inexpensive. If the lots, on the other hand, required installation of sewage systems for which permission must first be obtained from the Pennsylvania Department of Environmental Resources ("DER"), the purchaser might face delay, difficulty and substantial additional expense.

In actual practice the local Township would not, unless state approval had first been obtained, issue a permit for any septic tank sewage disposal system other than the standard or conventional type which comprised a septic tank and disposal area consisting of an underground tile field, seepage bed or serial distribution system. The government introduced evidence to the effect that because of unfavorable soil conditions known to the defendants each of the lots that were the subject of the fraud counts on which they were convicted was unsuitable for such a conventional septic tank system or for any other type of system that would be approved by the local Township and that each lot would require a special corrective system in the form of an above-ground sand filter bed

---

6. The Statement of Record, after advising that septic tanks were to be used for all lots at an average cost of $600 each, stated

   "8. This method of sewage disposal has been approved by the Penn Forest Township Supervisors under ordinance of the township and pursuant to rules and regulations and standards of Pennsylvania Department of Health.

   "9. The State Health Department requires percolation tests to determine suitability for the use of septic tanks. The developer's engineers have made such tests and the report of these tests is attached hereto in the Exhibit shown."

7. The Property Report advised that the buyer could provide for sewage disposal by constructing a septic tank at an average cost of

$600, which method, according to the developer's consulting engineer, "is acceptable for the subdivision under current state and local health regulations," that in some instances "additional corrective work in the form of construction of a sand filter bed may be necessary to permit installation of a septic tank," bringing the total cost of sewage facilities to $1,200, that a permit must first be obtained from local authorities, that the buyer should first determine the availability of the permit from local authorities and that "[t]he developer has obtained a letter from the Penn Forest Township Supervisors that the use of septic tanks and other on-lot sewage disposal facilities will be approved for use in Hickory Run Forest subdivision upon issuance of a permit."

known as a "turkey mound." According to the policy and practice of the Pennsylvania DER, which was set forth in its manual and instructions to local sewage enforcement officers and adhered to in practice by the Township's sewage officer, the Township would not issue a permit for a "turkey mound" or other type of exotic sewage system, such as a below-ground sand filter bed or an aerobic tank. In practice state DER approval for such systems was required. This policy and practice of the DER and Township was known to the engineer, Joseph Michel, who had been employed by the defendants to study HRF and advise as to the sewage requirements that must be met by prospective purchasers of lots.

In May, 1971, prior to the representations made by PIC to purchasers that local Township approved of septic tank systems required to be installed on their lots would be forthcoming, Michel, who had studied and tested the HRF area and had reviewed reports of the federal Soil Conservation Service on HRF, advised Goldberg that approximately 20% of the lots had slow percolation rates, stoniness, shallowness, high water tables, or other severe limitations requiring special systems, such as aerobic tanks or evapo-transpiration beds, which could be installed only with state approval. Dr. Glade Loughry, Chief of the Soil Science Unit of DER, testified that a large portion of HRF was unsuitable for septic tanks with standard drainage systems and that each of the lots referred to in the counts upon which defendants were convicted was unsuitable for conventional-type subsurface sewer disposal because the water table was within four feet or less of the surface of the soil.

At trial the government contended that state approval was required for any system other than a conventional subsurface disposal system, whether the special corrective system was above or below ground. More specifically the government argued that a subsurface sand filter system required state approval. The court, however, ruled that, notwithstanding the DER policy as set forth in its

manual and the local Township practice, state approval was not clearly required by DER Regulations for subsurface sand filters but that it was required for above-ground sand filters, i. e., "turkey mounds." Accordingly, Judge Brieant dismissed those counts involving lots where subsurface sand filters might be installed, leaving those counts naming lots that would require a "turkey mound" type of system. These were the fraud counts upon which defendants were convicted.

## DISCUSSION

■ Appellants argue that their fraud convictions must be reversed on the ground that the district court improperly permitted the indictment to be constructively amended by allowing the case to go to the jury on unalleged charges and facts. See *Russell v. United States,* 369 U.S. 749, 770–71, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). First it is claimed that although the indictment charged the defendants with falsely representing to purchasers of HRF lots that they could construct "on-site septic tank systems which would be approved by the Township of Penn Forest" the court permitted the case to be presented on the theory that they falsely represented the lots to be suitable for "conventional" septic tank systems for which permits would be issued by the Township. The use of the word "conventional," it is argued, amounted to a material and prejudicial variance. We disagree.

The record reveals that the term "conventional system," which significantly is used in the introductory part of the indictment, was defined at trial and understood by all parties to be merely a cryptic colloquial method of referring to the type of simple standard system which would require only Township, as distinguished from DER, approval. Moreover the defendants not only failed to object to use of the term, thus waiving any objection to its use, see *United States v.*

*Indiviglio,* 352 F.2d 276 (2d Cir. 1965), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966), but themselves used it in their examination of witnesses, including Michel, their own engineer, who used the term in describing on-lot sewage systems and defined it as the simple standard system for which Township officials could issue permits, as distinguished from systems requiring state DER approval. The fraud proved by the government, therefore, was the fraud alleged in the indictment. No new fraud or new theory of fraud was added as the basis for conviction.

■■■■ Appellants next urge that the indictment was constructively amended by permitting the government, despite the fact that the land fraud counts (like the mail fraud counts) referred specifically only to certain mailings as a means of interstate commerce used to carry out the fraud, to introduce proof of non-mail interstate activity, such as interstate transportation and telephone. This contention borders on the frivolous. The indictment's allegation of specific mailings as a basis of jurisdiction did not preclude the government from offering evidence of use of other interstate facilities. The offense was the land fraud, not the jurisdictional element. *United States v. Blassingame,* 427 F.2d 329, 330 (2d Cir. 1970), *cert. denied,* 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971). Moreover, the indictment contained a general allegation of the use of inter-. state facilities, along with its allegation of the specific mailings. Cf. *United States v. Conti,* 361 F.2d 153, 157–58 (2d Cir. 1966) *vacated and remanded on other grounds,* 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968). Indeed, appellants' counsel, in arguing unsuccessfully in the district court that joinder of the mail fraud and land fraud counts was multiplicitous, conceded that "the Government is free to prove the Title 15 fraud counts by establishing the use of any interstate facility or the mails." In any event, as the convictions on the mail fraud counts demonstrate, the interstate mailings were established and no prejudice is shown to the defendants as the result of the government's proof of other jurisdictional bases. The crimes for which they stand convicted are clearly those alleged in the indictment.

Appellants' attack upon the district court's interpretation of certain DER regulations as the basis for conviction raises a more serious question. Specifically, appellants contend that there was no misrepresentation because the Township, notwithstanding the practice and policy of DER, possessed the unrestricted power under the Pennsylvania Sewage Facilities Act, 35 P.S. § 750.1 et seq., and DER Regulations promulgated thereunder to issue permits for "septic tank systems" without restriction, see § 7, Penn. Sewage Facilities Act. This power, the argument goes, could not be voluntarily surrendered by the Township and could be withdrawn or taken over by the DER only by following a procedure prescribed by its own Regulations (Ch. 71, § 71.31), which had not occurred in the case of the Township. Appellants further urge that the district court erred in interpreting two sections of the DER's Regulations as requiring state DER approval for the construction of a "turkey mound." The two sections read as follows:

"Subchapter B. INDIVIDUAL SEWAGE DISPOSAL FACILITIES

GENERAL

"§ 73.11. *Overall requirements.*

\*    \*    \*    \*    \*    \*

"(e) The maximum elevation of the groundwater table shall be at least four feet below the bottom of the excavation for the leaching area. Rock formations and impervious strata shall be at a depth greater than four feet below the bottom of the excavation."

"ABSORPTION AREA REQUIREMENTS

"§ 73.61. *General.*

"(a) When the percolation rate is over 60 minutes per inch, a subsurface disposal system as described in this Chapter shall not be used. Proposed

alternate methods shall not be used unless approved by the Department."

The trial judge reasoned that the term "alternate" as used in the second sentence of § 73.61(a) refers to those systems which may be installed as alternatives to "subsurface" systems. Under this construction a "turkey mound," being above the surface, would require DER approval. This interpretation confirmed the view that had been taken by the DER, which required that its approval be obtained for "turkey mounds." Appellants, on the other hand, argue that § 73.61(a), in using the term "alternate," was intended to refer only to methods that might be required because of an excessively slow soil percolation rate and not to those adopted in response to a higher water problem.

■ Appellants' restrictive interpretation of the two sections of the DER regulations has some facial appeal. However, the DER's construction not only gives effect to the literal language of the regulations but is in accord with the overall purposes and scheme of the Pennsylvania Sewage Facilities Act, which is to delegate to the DER in the first place the power to promulgate regulations for the "adoption of standards for construction and installation of individual and community sewage disposal systems" (§ 9). These standards are then to be applied and administered by the municipalities. Where no standards had yet been adopted by the DER for a particular type of system (such as turkey mound or other exotic method of sewage disposal) it was reasonable and in accordance with the policy and purpose of the Act to interpret it as requiring approval

of such a system by the DER as the agency vested with authority to establish state-wide controlling standards.[8]

■ The DER's interpretation, furthermore, being that of the agency which not only promulgated the regulations but is responsible for their state-wide administration, is entitled to considerable respect. See, e. g., *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 62 S.Ct. 1215, 89 L.Ed. 1700 (1945); *Gulf Oil Corp. v. Hickel,* 140 U.S. App.D.C. 368, 435 F.2d 440, 444–45 (D.C. Cir. 1970). Any other interpretation of the regulations could lead to conflicting policies on the part of municipalities throughout the state, varying according to each local township's views.

■ In any event, defendants' convictions here do not turn solely upon the district court's interpretation of the foregoing regulations. Whether or not the regulations were vague or the DER's construction of them strained, appellants knew that DER had insisted in practice that its approval would be required for turkey mounds or similar exotic systems (such as aerobic tanks or evapo-transpiration beds), and that the Township, although it would issue permits for standard conventional systems, would not issue a permit for such unconventional systems[9] unless DER approval had first been obtained. Nevertheless the defendants not only failed to advise the purchasers of the lots for which defendants were convicted that DER approval for turkey mounds or aerobic tanks would be required but falsely stated that *"This method of sewage disposal* [i. e., septic tanks costing approximately $600 each] *has been approved by the Penn Forest*

---

8. For instance, the regulations expressly required state approval for aerated systems. See, e. g., § 73.41 which provided:

"AEROBIC SEWAGE TREATMENT SYSTEMS

"§ 73.41. *General*

"(a) Aerobic sewage treatment systems shall be installed only on an experimental basis. No approving body shall issue a permit for the installation of an aerobic sewage treatment system without prior written approval by the Department."

9. Michel, PIC's engineer, advised Goldberg "about aerated tanks, sand filters and bringing fill in and that the conditions would require a [sewage disposal] design which would have to be approved by the Department of Health [predecessor of the DER]," (Tr. 421). Michel also wrote a letter to PIC, dated May 4, 1971 advising that, while on-site systems were feasible, standards for aerated tanks and subsurface sand filter beds were necessary and would have to be met in some cases.

*Township Supervisors"* and that the developer had obtained a letter from the Supervisors that "the use of septic tanks and other on-lot sewage disposal facilities *will be approved* for use in Hickory Run Forest subdivision upon issuance of a permit." (Emphasis supplied). In fact the method of sewage disposal utilizing septic tanks of the type that could be installed at a cost of $600 each had not been approved by the Township for the lots in question. Nor did the Township's letter to PIC (dated May 3, 1971) state that it would approve "the use of septic tanks and other on-lot sewage disposal facilities" of the type that might involve construction of a sand filter bed, much less that it would approve "turkey mounds." The Township's letter simply stated that it would approve septic tanks and other on-lot sewage disposal facilities for use in HRF "upon issuance of a permit under ordinance of this township and pursuant to rules, regulations and standards of the Pennsylvania Department of Health, all as required under the Pennsylvania Sewage Facilities Act." (A. 153) The letter amounted to nothing more than a statement that the Township would give whatever approval it was permitted to give under state and local law. Viewed as a whole this evidence, together with the other proof, was sufficient to permit the jury to find the defendants guilty of the fraud charges.

We have carefully considered appellants' other claims of error and find them to be without merit. Judge Brieant's charge to the jury was reasonably clear and accurate rather than confusing or ambiguous as appellants now claim. Indeed, none of the alleged errors were called to his attention at trial. In the absence of plain error, which does not exist, this failure to object precludes reversal. Rule 30, F.R.Cr.P.; *United States v. Pinto,* 503 F.2d 718, 723–24 (2d Cir. 1974). Goldberg's conviction for the sale of unregistered land is also amply supported by record evidence. Appellants' attack on Failla's testimony as being replete with "palpable weakness and glaring inconsistencies" was apparently rejected by the jury, which is the final arbiter of credibility. Moreover, there was sufficient evidence, aside from Failla's testimony to sustain the verdict. The joinder of the fraud and non-registration counts, being based upon identical acts and transactions which formed part of a single scheme and were established in large measure by the same evidence, was not improper, *United States v. Adams,* 434 F.2d 756 (2d Cir. 1970). Appellants' claim of improper joinder was in any event waived by failure prior to or during trial to move for a severance or a direction that the government be required to elect the counts to be tried. See *United States v. Papadakis,* 510 F.2d 287, 300 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. Perl,* 210 F.2d 457, 461–62 (2d Cir. 1954). No legally recognizable reason is advanced in support of appellants' demand for reconsideration of Goldberg's sentence which, being within the statutory limits and not subject to attack as unlawful, is not reviewable. *Dorszynski v. United States,* 418 U.S. 424, 440–41, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974).

The convictions are affirmed.